**TELECOMMUNICATIONS RESEARCH AND ACTION CENTER and Media Access Project, Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,**

National Association of Broadcasters, Public Broadcasting Service, American Newspaper Publishers Association, Intervenors.

No. 85–1160.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 20, 1986.

Decided Sept. 19, 1986.

As Amended Sept. 19, 1986.
Rehearing En Banc Denied Dec. 16, 1986.

**502**

Robert M. Gurss, with whom Andrew Jay Schwartzman and Henry Geller, Washington, D.C., were on brief, for petitioners.

C. Grey Pash, Jr., Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., John J. Powers, III and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.

Richard E. Wiley, Michael Yourshaw, William B. Baker and W. Terry Maguire, Washington, D.C., were on brief, for intervenor, American Newspaper Publishers Assn.

Henry L. Baumann, Michael D. Berg and Steven A. Bookshester, Washington, D.C., entered appearances for intervenor, National Ass'n of Broadcasters.

Peter Tannenwald, Lawrence A. Horn and Barbara S. Wellbery, Washington, D.C., entered appearances for intervenor, Public Broadcasting Service.

Before BORK and SCALIA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge BORK.

Opinion concurring in part and dissenting in part filed by Senior Circuit Judge Mac-KINNON.

BORK, Circuit Judge:

Petitioners challenge the Federal Communications Commission's decision not to apply three forms of political broadcast regulation to a new technology, teletext. Teletext provides a means of transmitting textual and graphic material to the television screens of home viewers.

The Communications Act of 1934, 47 U.S.C. § 312(a)(7) (1982), requires broadcast licensees to "allow reasonable access ... for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy." In addition, under 47 U.S.C. § 315(a) (1982), if the licensee "permit[s] any person who is a legally qualified candidate for any public office to use a broadcasting station," he or she incurs the additional obligation of "afford[ing] equal opportunities to all other such candidates for that office." Complementing these statutory provisions, there exists a form of political broadcast regulation that the Commission created early in its history in the name of its mandate to ensure the use of the airwaves in the "public 'convenience, interest, or necessity.'" See Red Lion Broadcasting v. FCC, 395 U.S. 367, 376–77, 89 S.Ct. 1794, 1799, 23 L.Ed.2d 371 (1969). The "fairness doctrine," as this policy is known, "provides that broadcasters have certain obligations to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." 47 C.F.R. § 73.1910 (1985).

The case before us presents the question whether the Commission erred in determining that these three political broadcast provisions do not apply to teletext. Because we find that the Commission acted reasonably with respect to section 312(a)(7) and the fairness doctrine, but erroneously held section 315 not to apply to teletext, we affirm in part and reverse in part, and

remand to the Commission for further proceedings.

## I.

The technologically novel element of teletext service is its utilization of an otherwise unused portion of the television broadcast signal. Television signals are not continuous but are sent in pulses. The human eye retains the image from one pulse to the next so that the picture is perceived as uninterrupted. The time between the pulses of regular television broadcasting ("main signal" transmission) is known as the "vertical blanking interval," and can be used for pulses that constitute teletext transmission. As treated by the Commission in the docket now before us, "teletext" refers exclusively to such over-the-air transmissions, and not to transmission of text and graphics by way of cable or telephone. Main signal operators now control and operate teletext, though the FCC has authorized the operation of teletext "on a franchise basis" or through the "leas[ing]" of space to multiple users." *See Report and Order*, 53 Rad.Reg.2d (P & F) 1309, 1321 (1983). The Commission, however, admonished licensees "that they remain responsible for all broadcast related teletext provided via the station's facilities, whether produced in-house or obtained from outside sources." *Id.*

To receive teletext, the viewer must have a device to decode the signal carrying the textual information and graphics. Currently, viewers may purchase teletext decoders in retail stores selling television sets. In the future, at least some television manufacturers will build decoding equipment into selected television models. Broadcasters of teletext thus have no control over who obtains the ability to decode teletext signals.

The teletext viewer begins typically by watching the display of a table of contents, which indicates what information is available and at which pages it appears. A "page" is a screen of information. Viewers may then view the information they want by flipping to the page where the desired material appears. Present teletext programming includes data of general interest such as news, sports, weather, community events, and advertising, though nothing precludes broadcasters from displaying information that appeals to audiences with special interests. Main channel broadcasting may notify viewers of material available on teletext. While teletext can display text and high-resolution graphics, no sound accompanies the visual transmissions under teletext technology. Teletext is supported by advertiser fees and involves no charge to the public.

On November 27, 1981, the FCC released a Notice of Proposed Rulemaking to explore possible authorization for television stations to operate teletext systems. *See* 46 Fed.Reg. 60,851 (1981). The Commission announced its goal "to provide a regulatory environment that is conducive to the emergence and implementation of new technology and new uses of the [broadcast] spectrum." *Id.* The Commission added that "[i]n the case of teletext, the available evidence appears to indicate that the forces of competition and the open market are well suited to obtaining the kinds and amounts of service that are most desirable in terms of the public interest." *Id.* at 60,852. The Notice therefore proposed that "teletext ... be treated as an anciallary [sic] service" and that "[s]tations ... not be required to observe service guidelines or other performance standards." *Id.* at 60,853.

In its *Report and Order*, 53 Rad.Reg.2d (P & F) 1309 (1983), the Commission addressed the applicability of political broadcast requirements to teletext and concluded that "as a matter of law, ... sections [312(a)(7) and 315] need not be applied to teletext service," and that applying these provisions would be "both unnecessary and unwise as a matter of policy." *Id.* at 1322. Moreover, the Commission "conclude[d] that the Fairness Doctrine should not be applied to teletext services." *Id.* at 1324. Thus, the *Report and Order* sought to adopt an approach of non-regulation of tel-

etext under any of the political broadcasting provisions administered by the FCC.

The Commission noted that section 312(a)(7) guarantees federal candidates only "'reasonable access'" to "a broadcasting station" and considered what access would be "reasonable" when dealing with "variant broadcast services" such as teletext. *See* 53 Rad.Reg.2d (P & F) at 1322. Relying on *Commission Policy in Enforcing Section 312(a)(7) of the Communications Act of 1934*, 68 F.C.C.2d 1079, 1093 (1983), the FCC suggested that by providing a candidate access to the broad television audience attracted to the station's regular broadcast operation a licensee satisfied its section 312(a)(7) duties even if the broadcaster at the same time denied access to the more limited audience viewing the "ancillary or subsidiary" teletext service. *See* 53 Rad.Reg.2d (P & F) at 1322-23.

In contrast, the Commission found section 315 wholly inapposite to teletext. Noting that a broadcast "use" triggered section 315's substantive obligations, that a "use" required "a personal appearance by a legally qualified candidate by voice or picture," and that the textual and graphics nature of teletext made it "inherently not a medium by which a candidate [could] make a personal appearance," the Commission held that teletext could not trigger the requirements of section 315. *See* 53 Rad. Reg.2d (P & F) at 1323. The Commission also reasoned that teletext differed from "traditional broadcast programming" because it does not have the powerful audiovisual capabilities of main-channel broadcasting, and, therefore, does not pose the danger of "abuse" of these powerful sound and image "uses" that Congress envisioned in enacting section 315. *See id.*

The Commission reserved its most elaborate analysis for the fairness doctrine. It began with the contention that the fairness doctrine is a Commission-made policy, and that Congress did not codify the fairness doctrine when it added language recognizing that policy in the course of a 1959 amendment to section 315. 53 Rad.Reg.2d

(P & F) at 1323. Thus, the 1959 amendment does not compel extension of the fairness doctrine to "new services ... which did not even exist" at the time, and applications of the doctrine to serve the public interest rests in the Commission's "sound judgment and discretion." *See id.*

The Commission then determined that it should not apply the fairness doctrine to teletext, "primarily [because of] a recognition that teletext's unique blending of the print medium with radio technology fundamentally distinguishes it from traditional broadcast programming." 53 Rad.Reg.2d (P & F) at 1324. Noting that "scarcity" of broadcast frequencies provided the first amendment justification of the fairness doctrine's application to traditional broadcast media, the Commission posited an "[i]mplicit ... assumption that ... power to communicate ideas through sound and visual images ... is significantly different from traditional avenues of communication because of the immediacy of the medium." *Id.* In other words, because scarcity inheres in all provisions of goods and services, including the provision of information through print media, the lessened first amendment protection of broadcast regulation must also rely upon the powerful character of traditional broadcasting. Because teletext "more closely resembles ... other print communication media such as newspapers and magazines," the Commission found the "scarcity" rationale, as reinterpreted, insufficient to justify regulating teletext.

The Commission also reasoned that teletext, as a print medium in an "arena of competition ... includ[ing] all other sources of print material," would not encounter the same degree of scarcity, in the usual sense, as the sound and visual images of regular programming. *See* 53 Rad. Reg.2d (P & F) at 1324. Thus, the Commission felt it constitutionally suspect to apply the fairness doctrine to teletext. And, in light of its obligation to "encourage, not frustrate, the[ ] development" of new services like teletext, the FCC decided, therefore, to heed concerns of commenters that

teletext services might not prove "viable if ... burdened by Fairness Doctrine obligations" and to exempt teletext from the fairness doctrine. *See id.*

Two motions for reconsideration of the decision not to apply content regulation to teletext were filed. Media Access Project ("MAP"), a petitioner in this appeal, argued that "[t]eletext ... is intended for the general public," and, therefore, falls within the definition of "broadcasting" in the Communications Act of 1934 and triggers broadcast regulation. *See* J.A. at 111–12. MAP argued that section 312(a)(7) required a licensee "'to tailor [its] responses [to requests for air time] to accommodate, as much as reasonably possible, a candidate's stated purposes in seeking air time,'" an individualized approach inconsistent with the sweeping holding of the *Report and Order. See* J.A. at 112 (citing *Columbia Broadcasting System, Inc. v. FCC*, 453 U.S. 367, 387, 101 S.Ct. 2813, 2825, 69 L.Ed.2d 706 (1981)). MAP generally contended that teletext had broad audience potential, a good capacity to convey political information, and that the Commission must ensure access to teletext service. *See id.* at 113.

With respect to section 315, MAP took issue with the FCC's view that teletext does not meet the standards for a "use." First, MAP argued that teletext could "produce graphic images, including ... perfectly recognizable portraits of ... candidates," and, therefore, met the Commission's prior definition of a "use" as "'any broadcast or cablecast of a candidate's voice or picture.'" *See* J.A. at 116, 117. But even if teletext had not possessed such visual capabilities, MAP urged that the Commission would have a duty to redefine "use" to account for this new form of broadcasting technology. *See* J.A. at 117.

As for the fairness doctrine, MAP contended that "[t]he standard of fairness ... inheres in the public interest standard" the FCC is charged with enforcing, and that by the 1959 amendments "Congress did not merely 'ratify' the Commission's fairness doctrine ... [but] clearly made [it] a binding part of the statute." J.A. at 118, 119. MAP argued, therefore, that the FCC lacked the discretion to refuse to apply the fairness doctrine to teletext broadcast operations.

The other Petition for Reconsideration, filed by Henry Geller, Donna N. Lampert, and Philip A. Rubin, made many of the same legal arguments put forward by MAP. Their petition added that the characterization of "teletext as 'ancillary,' 'novel,' or 'a print medium'" could not avoid the requirements of political broadcast regulation, and that the scarcity doctrine had nothing to do with the "immediacy" of traditional broadcasting's sounds and images. J.A. at 126–27 & n. 6. This petition also urged that the full panoply of political broadcasting regulation be applied to teletext.

On November 8, 1984, the Commission rejected these petitions in a *Memorandum Opinion and Order*, 101 F.C.C.2d 827 (1985). While the *Memorandum Opinion and Order* largely rehearsed the points made in the Commission's earlier decision, the Commission elaborated upon the legal relevance of the differences between teletext and traditional broadcasting:

We consider teletext clearly as an ancillary service not strictly related to the traditional broadcast mode of mass communication. First, the very definition of teletext confined the service to traditional print and textual data transmission. Thus, although these data will be transmitted at some point through the use of the electromagnetic spectrum, its primary and overriding feature will be its historical and cultural connection to the print media, especially books, magazines and newspapers. Users of this medium will not be listening or viewing teletext in any traditional broadcasting sense, but instead will be *reading* it, and thus be able to skip, scan and select the desired material in ways that are incomparable to anything in the history of broadcasting and broadcast regulation. In this light, we believe that the content regulations created for traditional broadcast op-

erations are simply out of place in this new print-related textual data transmission medium. We decline to attribute to Congress an intent to extend broadcast content regulation ... to this new medium.

*Id.* at 833 (citations and footnote omitted; emphasis in original).

The Commission also provided further explanation of its first amendment theory and made clear that it meant this theory to cover the applicability of all forms of political broadcasting regulation to teletext. Relying upon *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (striking down a state's newspaper right-of-reply statute as running afoul of the first amendment's protection of editorial judgment and control), and asserting that it considered teletext a "print medium" for first amendment purposes, *see* 101 F.C.C.2d at 834 & n. 16, the Commission found that "neither the letter nor the purposes of the First Amendment would be served by ... a ruling" that would "require[ ] [the Commission] to intrude into the editorial judgments of teletext editors." *Id.* at 834. Given *Tornillo's* clear refusal to allow interference with editorial judgments in the print media and "the historical sensitivity of Congress to these [first amendment] issues," the Commission would not "construe the intent of Congress to apply Section 315 and similar statutory provisions, and ... associated rules and policies, to the teletext medium." *Id.* (footnote omitted). Accordingly, the Commission adhered to the results of its earlier *Report and Order.*

On June 3, 1985, the Telecommunications Research and Action Center and the Media Access Project ("TRAC/MAP") filed a petition for review in this court, largely renewing the substantive legal arguments assert-

ed in the petitions for reconsideration below. Because the Commission's interpretation of the first amendment affects its analysis of political broadcasting regulation and teletext at several points, we discuss that interpretation first. We then address the petitioners' contentions with respect to section 312(a)(7), section 315, and the fairness doctrine in that order.

## II.

In the Commission's view the regulation of teletext's "unique blend of the print medium with radio technology" raises first amendment problems not associated with the regulation of traditional broadcasting. Thus, the argument goes, existing Supreme Court precedent upholding political content regulation of traditional broadcasting does not necessarily justify the application of such regulation to the new medium of teletext. While not concluding that this application to a "print medium" like teletext would violate the first amendment, the Commission suggested that its application of that regulation would be sufficiently suspect to justify not imputing to Congress an intent to apply "section 315 and similar statutory provisions, and ... associated rules and policies, to the teletext medium." 101 F.C.C.2d at 834. To appreciate the Commission's argument, a brief discussion of the case law will be useful.

In *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Supreme Court rejected a first amendment challenge to the fairness doctrine and related rules governing personal attacks and political editorials by licensees. In reasoning that applies generally to political broadcasting regulation,[1] the Court found justification for limiting first amendment protection of broadcasting in the "scarcity doctrine."[2] Given the fact of a

---

1. *Red Lion* expressly noted that the equal-time provision of § 315 was "indistinguishable" "[i]n terms of constitutional principle" from the implementing regulations of the fairness doctrine before the Court. 395 U.S. at 391, 89 S.Ct. at 1807. While § 312(a)(7) had not yet been enacted at the time of *Red Lion,* it seems clear that the opinion's rationale applies with equal force

to that provision, which affects broadcasters in a very similar manner to the fairness doctrine requirement that a broadcaster provide adequate aid time to the discussion of public issues.

2. The notion that scarcity of broadcast frequencies could provide constitutional justification for broadcast regulation first arose in *National*

limited number of broadcast frequencies and the "massive" problem of broadcast interference, the Court remarked that "only a tiny fraction of those with resources and intelligence can hope to communicate by radio at the same time if intelligible communication is to be had, even if the entire radio spectrum is utilized in the present state of commercially acceptable technology." *Id.* at 388, 89 S.Ct. at 1805. The Court observed that this necessitated the division of the radio spectrum into usable portions, the assignment of subdivisions of the frequency to individual users, and regulation under which the "Government ... tell[s] some applicants that they [cannot] ... broadcast at all because there [is] room for only a few." *Id.* Therefore, the Court asserted, because "there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write or publish." *Id.*

Observing that licensees and those who can obtain no license have identical first amendment rights, the Court in *Red Lion* further concluded that

> [t]here is nothing in the First Amendment which prevents the Government from requiring a licensee to share his frequency with others and to conduct himself as a proxy or fiduciary with obligations to present those views and voices which are representative of his community and which would otherwise, by necessity, be barred from the airwaves.

395 U.S. at 389, 89 S.Ct. at 1806. The Court then enunciated the classic formulation of the scarcity doctrine:

> Because of the scarcity of radio frequencies, the Government is permitted to put restraints on licensees in favor of others whose views should be expressed on this unique medium. But the people as a

whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment. It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount.

*Id.* at 390, 89 S.Ct. at 1806. It was on this principle that the Court found no first amendment infirmity in political broadcast regulation.

The Commission believes, however, that the regulation of teletext falls not within the permissive approach of *Red Lion,* but rather within the strict first amendment rule applied to content regulation of the print media. In *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the Court struck down an editorial right-of-reply statute that applied to newspapers. The content regulation in *Tornillo* bore a strong resemblance to that upheld in *Red Lion.* In *Tornillo* the Court held that such regulation impermissibly interfered with the newspapers' "editorial control and judgment." *Id.* at 258, 94 S.Ct. at 2840. The Court made the broad assertion that "[i]t has yet to be demonstrated how governmental regulation of this crucial [editorial] process can be exercised consistent with the First Amendment guarantees of a free press." *Id.* If the Commission's view is correct, and *Tornillo* rather than *Red Lion* applies to teletext, that service is entitled to greater first amendment protections than ordinary broadcasting and it would be proper, at a minimum, to construe political broadcasting provisions narrowly to avoid constitutionally suspect results.

The Commission has offered two grounds for its view that *Tornillo* rather than *Red Lion* is pertinent. Both reasons relate to the textual nature of teletext service. First, the Commission read an "im-

---

*Broadcasting Co. v. United States,* 319 U.S. 190, 226–27, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943). In his opinion for the majority, Justice Frankfurter enunciated the scarcity rationale to turn back a first amendment challenge to the FCC's chain broadcasting regulations, which governed

the affiliation of stations with networks. *Id.* Until *Red Lion,* however, the Court had never addressed the question whether the scarcity doctrine could justify regulation of the content of broadcasts.

mediacy" component into the scarcity doctrine:

> Implicit in the "scarcity" rationale ... is an assumption that broadcasters, through their access to the radio spectrum, possess a power to communicate ideas through sound and visual images in a manner that is significantly different from traditional avenues of communication because of the immediacy of the medium.

53 Rad.Reg.2d (P & F) at 1324. Second, the Commission held that the print nature of teletext "more closely resembles, and will largely compete with, other print communication media such as newspapers and magazines." *Id.* Under this analysis, scarcity of alternative first amendment resources does not exist with respect to teletext. We address these points in turn.

■ With respect to the first argument, the deficiencies of the scarcity rationale as a basis for depriving broadcasting of full first amendment protection, have led some to think that it is the immediacy and the power of broadcasting that causes its differential treatment. Whether or not that is true, we are unwilling to endorse an argument that makes the very effectiveness of speech the justification for according it less first amendment protection. More important, the Supreme Court's articulation of the scarcity doctrine contains no hint of any immediacy rationale. The Court based its reasoning entirely on the physical scarcity of broadcasting frequencies, which, it thought, permitted attaching fiduciary duties to the receipt of a license to use a frequency. This "immediacy" distinction cannot, therefore, be employed to affect the ability of the Commission to regulate

public affairs broadcasting on teletext to ensure "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences." *Red Lion,* 395 U.S. at 390, 89 S.Ct. at 1807.

The Commission's second distinction—that a textual medium is not scarce insofar as it competes with other "print media"—also fails to dislodge the hold of *Red Lion.* The dispositive fact is that teletext is transmitted over broadcast frequencies that the Supreme Court has ruled scarce and this makes teletext's content regulable. We can understand, however, why the Commission thought it could reason in this fashion. The basic difficulty in this entire area is that the line drawn between the print media and the broadcast media, resting as it does on the physical scarcity of the latter, is a distinction without a difference. Employing the scarcity concept as an analytic tool, particularly with respect to new and unforeseen technologies, inevitably leads to strained reasoning and artificial results.

It is certainly true that broadcast frequencies are scarce but it is unclear why that fact justifies content regulation of broadcasting in a way that would be intolerable if applied to the editorial process of the print media. All economic goods are scarce, not least the newsprint, ink, delivery trucks, computers, and other resources that go into the production and dissemination of print journalism. Not everyone who wishes to publish a newspaper, or even a pamphlet, may do so. Since scarcity is a universal fact, it can hardly explain regulation in one context and not another.[3] The attempt to use a universal fact as a distinguishing principle necessarily leads to analytical confusion.[4]

---

**3.** As Professor Ronald Coase has observed,

it is a commonplace of economics that almost all resources used in the economic system (and not simply radio and television frequencies) are limited in amount and scarce, in that people would like to use more than exists. Land, labor, and capital are all scarce, but this, of itself, does not call for government regulation. It is true that some mechanism has to be employed to decide who, out of the many claimants, should be allowed to use the scarce resource. But the way this is usually

done in the American economic system is to employ the price mechanism, and this allocates resources to users without the need for government regulation.

Coase, *The Federal Communications Commission,* 2 J.L. & Econ. 1, 14 (1959).

**4.** One might attempt to resolve the tension between *Tornillo* and *Red Lion* on the ground that, while scarcity characterizes both print and broadcast media, the latter must be operating under conditions of greater "scarcity" than the

Neither is content regulation explained by the fact that broadcasters face the problem of interference, so that the government must define useable frequencies and protect those frequencies from encroachment. This governmental definition of frequencies is another instance of a universal fact that does not offer an explanatory principle for differing treatment. A publisher can deliver his newspapers only because government provides streets and regulates traffic on the streets by allocating rights of way. Yet no one would contend that the necessity for these governmental functions, which are certainly analogous to the government's function in allocating broadcast frequencies, could justify regulation of the content of a newspaper to ensure that it serves the needs of the citizens.

There may be ways to reconcile *Red Lion* and *Tornillo* but the "scarcity" of broadcast frequencies does not appear capable of doing so. Perhaps the Supreme Court will one day revisit this area of the law and either eliminate the distinction between print and broadcast media, surely by pronouncing *Tornillo* applicable to both, or announce a constitutional distinction that is

more usable than the present one. In the meantime, neither we nor the Commission are free to seek new rationales to remedy the inadequacy of the doctrine in this area. The attempt to do that has led the Commission to find "implicit" considerations in the law that are not really there. The Supreme Court has drawn a first amendment distinction between broadcast and print media on a premise of the physical scarcity of broadcast frequencies. Teletext, whatever its similarities to print media, uses broadcast frequencies, and that, given *Red Lion*, would seem to be that.[5]

The Commission, therefore, cannot on first amendment grounds refuse to apply to teletext such regulation as is constitutionally permissible when applied to other, more traditional, broadcast media. We now turn to the consideration of the particular regulation at issue in this case.

### III.

■ Section 312(a)(7) states that "[t]he Commission may revoke any station license or construction permit ... for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable

---

former. This, however, is unpersuasive. There is nothing uniquely scarce about the broadcast spectrum. Broadcast frequencies are much less scarce now than when the scarcity rationale first arose in *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), and it appears that currently "the number of broadcast stations ... rivals and perhaps surpasses the number of newspapers and magazines in which political messages may effectively be carried." *Loveday v. FCC,* 707 F.2d 1443, 1459 (D.C.Cir.), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983). Indeed, many markets have a far greater number of broadcasting stations than newspapers.

5. We do not mean to suggest here that *Red Lion* poses a permanent bar to the dismantling of political broadcast regulation, the soundness of which has come under much well-placed criticism for some time and from many quarters. *See, e.g.,* Fowler & Brenner, *A Marketplace Approach to Broadcast Regulation,* 60 Tex.L.Rev. 207 (1982); Bazelon, *FCC Regulation of the Telecommunications Press,* 1975 Duke L.J. 213. The Supreme Court has suggested avenues of constitutional attack on political broadcast regulation that remain open to exploration. For example, in *Red Lion* itself, the Court stated that "if experience with the administration of these doc-

trines indicates that they have the net effect of reducing rather than enhancing the volume and quality of coverage, there will be adequate time to reconsider the constitutional implications." 395 U.S. at 393, 89 S.Ct. at 1808. Moreover, the Court has recently suggested that the advent of cable and satellite technologies may soon render the scarcity doctrine obsolete, but declined to "reconsider [its] long-standing approach [to political broadcast regulation] without some signal from Congress or the FCC that technological developments have advanced so far that some revision of the system of broadcast regulation may be required." *FCC v. League of Women Voters of California,* 468 U.S. 364, 376–77 n. 11, 104 S.Ct. 3106, 3116 n. 11, 82 L.Ed.2d 278 (1984).

In a recent study of the fairness doctrine, the FCC has attempted to get the Court to reevaluate political broadcast regulation along these lines by undertaking to show both the negative practical impact of the fairness doctrine and the technological erosion of scarcity. *See* Inquiry into Section 73.1910 of the Commission's Rules and Regulations Concerning the General Fairness Doctrine Obligations of Broadcast Licensees, 102 F.C.C.2d 143 (1985).

amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy." 47 U.S.C. § 312(a)(7) (1982). The question here is the rationality of the Commission's decision about the applicability of this provision to teletext.

At the outset, we state what we understand the Commission's decision to be. In introducing its legal analysis, the Commission stated: "As discussed below, we have concluded that, as a matter of law, ... sections [312(a)(7) and 315] need not be applied to teletext service." 53 Rad.Reg.2d (P & F) at 1322. The Commission stated that "the statutory requirement of affording reasonable access is adequately satisfied by permitting federal candidates access to a licensee's regular broadcast operation; it does not require access to ancillary or subsidiary service offerings like teletext." *Id.* The *Report and Order's* analysis of section 312(a)(7) concluded by stating that the Commission "perceive[d] no legal requirement that licensees grant federal candidates access to their teletext offerings." *Id.* at 1323. Finally, in rejecting reconsideration of this issue in its *Memorandum Opinion and Order*, the FCC asserted: "Guided as we are in such matters by a reasonableness standard, we find that a broadcaster could satisfy the 'reasonable access' rights of a candidate without use of teletext." 101 F.C.C.2d at 834. We find it clear, therefore, that the Commission believes that a broadcaster cannot be deemed to have acted unreasonably under the statute on the ground that he or she adopts a policy refusing to permit any access to teletext. We now turn to our analysis of the Commission's conclusion on this point.

The scope of review in this case is quite narrow. In *Columbia Broadcasting System, Inc. v. FCC*, 453 U.S. 367, 386, 101 S.Ct. 2813, 2825, 69 L.Ed.2d 706 (1981) ("CBS"), the Supreme Court stated that, in enacting section 312(a)(7), Congress "[e]ssentially ... adopted a 'rule of reason' and charged the Commission with its enforcement." The Court also asserted that Congress "did not give guidance on how

the Commission should implement the statute's access requirement." *Id.* In such a case, where Congress has left a gap in the statutory scheme, "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed. 694 (1984) (footnote omitted). In the determination of whether the agency's decision has run afoul of these standards, the parties challenging the agency action bear the burden of proof. *See San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Commission,* 789 F.2d 26, 37 (D.C.Cir.1986) (en banc). Thus, we approach the question of the agency's construction of section 312(a)(7) with significant "judicial deference," CBS, 453 U.S. at 390, 101 S.Ct. at 2827, and we must uphold that construction if it is a "reasonable" one. *Chevron,* 467 U.S. at 844, 104 S.Ct. 2783. We now examine whether the "Commission's action represents a reasoned attempt to effectuate the statute's access requirement." CBS, 453 U.S. at 390, 101 S.Ct. at 2827.

Petitioners argue that section 312(a)(7), as interpreted by the Commission and the Supreme Court, "prohibit[s] ... blanket bans on candidate advertising and require[s] broadcasters to accommodate the reasonable needs of candidates." Brief for TRAC/MAP at 49. These standards, they contend, foreclose the Commission's adopting a general rule allowing a broadcaster to bar candidates from access to teletext without running afoul of section 312(a)(7). If we agree with petitioners that the Commission's decision in the teletext docket was inconsistent with the approach previously adopted by the Commission and approved by the Supreme Court, we must reverse and remand unless the agency has supplied "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ig-

nored." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

Petitioners rely heavily upon *CBS.* The Supreme Court in *CBS* reviewed the FCC's construction of section 312(a)(7) in connection with a determination that the television networks had failed to give President Carter reasonable access in order to announce his bid for reelection. In upholding the Commission's finding of a violation, the Court also upheld the individualized, case-by-case approach that the Commission had adopted in enforcing section 312(a)(7), *see, e.g., Commission Policy in Enforcing Section 312(a)(7) of the Communications Act*, 68 F.C.C.2d 1079 (1978) (*"1978 Policy Statement"*). The Court described the Commission's policy as follows:

> [Section 312(a)(7)] requests must be considered on an individualized basis, and broadcasters are required to tailor their responses to accommodate, as much as reasonably possible, a candidate's stated purposes in seeking air time.... If broadcasters take the appropriate factors into account and act reasonably and in good faith, their decisions will be entitled to deference even if the Commission's analysis would have differed in the first instance. But if broadcasters adopt "across-the-board policies" and do not attempt to respond to the individualized situation of a particular candidate, the Commission is not compelled to sustain their denial of access.

*CBS*, 453 U.S. at 387–88, 101 S.Ct. at 2825–26 (citations omitted). The Court approved the rationality of the Commission's standards proscribing the use of "blanket rules" to govern access and requiring that "each request ... be examined on its own merits." *See id.* at 389, 101 S.Ct. at 2826. Acknowledging that "the adoption of uniform policies might well prove more convenient for broadcasters," the Court nonetheless accepted the Commission's view that "such an approach would allow personal campaign strategies and exigencies of the political process to be ignored." *Id.* Because "§ 312(a)(7) assures a right of reasonable access to *individual* candidates for federal elective office, and the Commission's requirement that their requests be considered on an *individualized* basis is consistent with that guarantee," the Court upheld the Commission's approach. *Id.* (emphasis in original).

Contrary to petitioners' assertions, there is, we believe, no conflict between the Commission's section 312(a)(7) policy, as approved by the Supreme Court in *CBS*, and the decision made in the teletext docket. When the Supreme Court approved the Commission's policy of proscribing "blanket rules" or "uniform policies" concerning access, this meant only that broadcasters could not adopt policies that would effectively nullify the statute's rule of reason approach to granting access to federal candidates. This does not, and could not, suggest, however, that no rules may be applied in the determination of what access is reasonable under the statute. Reasonableness does not mean that an impressionistic judgment must be made in every case.[6] It would be impossible to follow a consistent policy with respect to reasonableness with-

---

**6.** The Commission has historically resorted to explicitly enunciated general principles in administering § 312(a)(7). The general principles have in some instances provided only factors to consider in determining reasonableness, such as "the amount of time previously sold to a candidate, the disruptive impact on regular programming, and the likelihood of requests for equal time by rival candidates under the equal opportunities provision of section 315(a)." *See CBS*, 453 U.S. at 387, 101 S.Ct. at 2825. Other principles utilized by the Commission have taken the form of presumptions, for example, that "[n]oncommercial educational stations generally need not provide Federal candidates with lengths of program time which are not a normal component of the station's broadcast day" or that "[l]icensees must provide prime-time program time absent unusual circumstances ... as part of their 'reasonable access' requirements." *1978 Policy Statement*, 68 F.C.C.2d at 1094. The Commission has also applied absolute decisional criteria, such as the unqualified rule that "[c]ommercial stations must make prime-time spot announcements available to Federal candidates." *See* The Law of Political Broadcasting and Cablecasting, 69 F.C.C.2d 2209, 2289 (1978).

out framing some rules to guide the decisions in particular cases. A rule of reason, as the course of antitrust law shows, implies a middle range of cases which require the individualized judgment and a nice balancing of competing factors. Within a rule of reason, however, there are also cases at the extremities of the spectrum where reasonableness or unreasonableness is clear. Thus, there are areas of per se legality and illegality within any rule of reason. In the context of section 312(a)(7), Congress has empowered the Commission to establish rules and regulations to guide broadcasters in their determination of what access is reasonable, *see CBS*, 453 U.S. at 386, 101 S.Ct. at 2825 (citing 47 U.S.C. § 303(r)), and, while the Commission has principally developed standards on a case-by-case basis, it has also identified some of the extreme cases in which the reasonableness or unreasonableness of a practice is clear.

The Court in fact approved the use of per se rules by assenting to the Commission's policy limiting the applicability of section 312(a)(7) to the period after a campaign commences, a limitation nowhere found in the statute. In this respect, the Court explained: "By confining the applicability of the statute to the period after the campaign begins, the Commission has limited its impact on broadcasters and given substance to its command of *reasonable* access." *CBS*, 453 U.S. at 388, 101 S.Ct. at 2826 (emphasis in original). This amounts to a rule of per se reasonableness: refusing access to a qualified federal candidate before the beginning of a campaign will never be held unreasonable under section 312(a)(7). Thus, when the Court stated that "the Commission's standards proscribe blanket rules concerning access," *see* 453 U.S. at 389, 101 S.Ct. at 2826, it was necessarily referring to rules whose effect would be to eliminate the case-by-case approach in the vast middle ground where reasonableness or unreasonableness is not clear. It did not mean that the Commission had foreclosed itself from adopting any rules defining the clear cases under the statute. In the teletext decision, that is all the Commission did; it merely adopted a rule of per se reasonableness as to a minor portion of the station's operations because it believed the reasonableness of that exclusion to be clear.

The acceptability of this approach is also shown by the Commission's treatment of subscription television ("STV") under section 312(a)(7) in its *1978 Policy Statement*, 68 F.C.C.2d at 1093. In that decision, the Commission accepted the argument that an STV station should not have to provide access for political broadcasting during the prime time hours that it is broadcasting because that would destroy one of the major incentives for such a service, "uninterrupted entertainment programming." *Id.* The Commission reasoned that

> [t]he purpose of giving to Federal candidates the right to prime time spots and programming is based upon the fact that prime time generally is the period of maximum audience potential. Since subscription television programming is generally geared to selective audiences it would appear that those stations engaged in STV have their maximum audience potential outside of normal prime time viewing periods. Therefore, we do not believe that reasonable access requires STV stations to make available to Federal candidates those periods of time in which they are engaged in STV programming.

*Id.* The Commission's reasoning clearly supports the general principle that the Commission can permit licensees to block out periods of time in which it would not be unreasonable to deny all access. Moreover, it appears that limited audience potential in the period of time foreclosed and the interest of preserving the vitality of the service are permissible factors in the determination of such general rules. Thus, in light of the Commission's approach to section 312(a)(7) in general and its holding in the STV decision in particular, we find that the general approach taken in the teletext docket is consistent with existing Commission precedent and the case-by-case approach utilized under section 312(a)(7).

Nor do we think that the Supreme Court's approving description of Commission policy "requir[ing] [broadcasters] to tailor their responses to accommodate, as much as reasonably possible, a candidate's stated purpose in seeking air time," *CBS,* 453 U.S. at 387, 101 S.Ct. at 2825, detracts from our conclusion. Petitioners argue that permitting licensees to refuse access to teletext allows broadcasters to ignore a candidate's desire both to provide "the public with detailed campaign information" and to discuss a complex set of campaign issues, and that this relieves the broadcaster of the need for the individualized tailoring of his or her response to the candidate's request. Brief for TRAC/MAP at 51. Implicit in the Commission's decision that a broadcaster need not provide access to teletext, however, is the conclusion that such purposes as discussion of complex issues may be satisfied by resort to the main channel. We cannot say that the Commission's conclusion is irrational. Complex campaign issues have been treated for years in television broadcasting, well before teletext, and we do not see, nor have petitioners directed us to, any evidence that carries the petitioners' burden of showing that main channel access cannot be tailored to satisfy, as much as reasonably possible, a candidate's desire for air time for such purposes. Accordingly, we affirm the Commission's decision with respect to section 312(a)(7).[7]

## IV.

■ Section 315 of the Communications Act of 1934 imposes two substantive obligations upon broadcast licensees. Section 315(a) requires a licensee to provide "equal opportunities" to competing candidates. In operative part, it provides:

If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station[.]

47 U.S.C. § 315(a) (1982). Section 315(b) imposes the so-called "lowest unit rate" obligation upon licensees. That provision declares:

The charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign for nomination for election, or election, to such office shall not exceed—

(1) during the 45 days preceding the date of a primary or primary runoff election and during the 60 days preceding the date of the general or special election in which such person is a candidate, the lowest unit charge of the station for the same class and amount of time; and

(2) at any other time, the charges made for comparable use of such station by other users thereof.

47 U.S.C. § 315(b) (1982). The predicates for the application of both parts of section 315 are the same. There must be "a legally qualified candidate for a public office," "a broadcasting station," and a "use" of

---

**7.** Petitioners offer an additional ground for challenging the Commission's decision regarding § 312(a)(7) and teletext. They claim that the decision "directly contradicts" Commission precedent holding that "[l]icensees may not adopt a policy that flatly bans Federal candidates from access to the types, lengths, and classes of time which they sell to commercial advertisers." The Law of Political Broadcasting and Cablecasting, 69 F.C.C.2d 2209, 2289 (1978). *See* Brief for TRAC/MAP at 50. We do not reach the question whether the teletext decision conflicts with this established Commission policy, for no one raised this argument before the agency and the Commission, therefore, had no opportunity to pass on it. Section 405 of the Communications Act has codified the requirement of exhaustion of administrative remedies, *see* 47 U.S.C. § 405 (1982), and this court has construed section 405 "to require complainants, before coming to court, to give the FCC a 'fair opportunity' to pass on a legal or factual argument." Washington Association for Television and Children v. FCC, 712 F.2d 677, 681 (D.C.Cir. 1983) (citing *Alianza Federal de Mercedes v. FCC,* 539 F.2d 732, 737 (D.C.Cir.1976)); *see also Neckritz v. FCC,* 502 F.2d 411, 417 (D.C.Cir. 1974). Thus, we do not consider this legal argument, which petitioners have advanced on appeal, but which no one presented to the Commission.

that station. The first of these is not at issue; the other two are dispositive.

Petitioners challenge the decision that section 315 does not apply to teletext on the ground that "[t]he Commission's ruling is clearly at odds with the statute." Brief for TRAC/MAP at 40. Congress has explicitly charged the FCC with "prescrib[ing] appropriate rules and regulations to carry out the provisions of ... section [315]." 47 U.S.C. § 315(d) (1982). "Accordingly, [the agency's] construction of the statute is entitled to judicial deference 'unless there are compelling reasons that it is wrong.'" *CBS*, 453 U.S. at 390, 101 S.Ct. at 2827 (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)). Even applying the considerable deference we owe the agency, however, we are unable to conclude that the agency's construction of the statute is a rational one, for it is plainly at odds with the language and intent of the statute. *See CBS*, 453 U.S. at 390, 101 S.Ct. at 2827. We believe that the agency erred in concluding that teletext does not constitute "traditional broadcast services" within the contemplation of the statute and that teletext is incapable of a "use" as that statutory term has evolved.

In section 153(*o*) of the Communications Act of 1934, Congress defined the term "broadcasting" to mean "dissemination of radio communications intended to be received by the public." 47 U.S.C. § 153(*o*) (1982). The Commission appears to have suggested that teletext transmissions are neither "radio communications" nor "intended to be received by the public." First, the Commission argued that the print nature of teletext differentiates it from more traditional types of electromagnetic transmissions, and that Congress, therefore, could not have intended to cover such a service under section 315. Second, the Commission distinguished teletext from "traditional broadcasting" in that teletext is an "ancillary" service. We address these points in turn.

The Commission's attempt to distinguish teletext from traditional broadcasting be-cause of teletext's textual and graphic nature conflicts with the plain intent of Congress. The proper starting place for statutory interpretation is with "the language employed by Congress." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979). On this question it is also the terminal point, for the definition of "radio communication" unmistakably includes such transmissions as teletext. In section 153(b) of the Act, Congress defined "radio communication" as

the transmission by radio of *writing, signs, signals, pictures,* and sounds *of all kinds,* including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

47 U.S.C. § 153(b) (1982) (emphasis added). The text could hardly be clearer. Teletext falls squarely within this definition. Teletext involves "print and textual transmission" and that is plainly covered.

The Commission's attempt to distinguish teletext from the "traditional broadcast mode of mass communication" by calling it an "ancillary" service, *see Memorandum Opinion and Order,* 101 F.C.C.2d at 833, departs without explanation from well-established precedent. Teletext and main channel broadcasting are merely different time intervals within the broadcast spectrum. Teletext is "ancillary" to main channel broadcasting only in the sense that it will probably not attract nearly as many viewers. But the Commission has explicitly held that the "number of actual or potential viewers is not significant" in determining whether something constitutes "broadcasting." *See Amendment of Part 73 of the Commission's Rules and Regulations (Radio Broadcast Services) to Provide for Subscription Television Service, Fourth Report and Order,* 10 Rad.Reg.2d (P & F) 1625, 1628 (1967). What matters is "an intent for *public* distribution." *Functional Music, Inc. v. FCC,* 274 F.2d 543, 548 (D.C.Cir.1958) (emphasis in original), *cert. denied,* 361 U.S. 813 (1959). Under the *Functional Music* test, recently reaffirmed

by this court in *National Association of Broadcasters v. FCC*, 740 F.2d 1190, 1201 (D.C.Cir.1984), an intent for public distribution exists when the licensee's "programming can be, and is, of interest to the *general* ... audience." 274 F.2d at 548 (emphasis original). The Commission has made no attempt to distinguish or repudiate this test, and no one disputes that teletext can and does carry programming, including news, sports, weather, and information about community events, of interest to a general audience. Given our conclusion about "radio communication," it is obvious that teletext service meets the statutory definition of "broadcasting" and that the Commission therefore erred in deciding that obligations applicable to "broadcasting stations" do not apply to teletext.

We reach a similar conclusion with respect to the Commission's efforts to establish as a matter of law that a candidate cannot "use" teletext within the meaning of section 315. In a careful analysis of the legislative history, Judge Maris concluded that Congress clearly intended section 315 to apply "only to the personal use of [transmission] facilities by the candidates themselves." *Felix v. Westinghouse Radio Stations, Inc.*, 186 F.2d 1, 5 (3d Cir.1950), *cert. denied,* 341 U.S. 909, 71 S.Ct. 622, 95 L.Ed. 1347 (1951). The Commission has accordingly defined a "use" as follows:

> In the case of *spots*, if a candidate makes any appearance in which he is identified or identifiable by voice or picture, even if it is only to identify sponsorship of the spot, the whole announcement will be considered a use. In the case of a *program*, the entire program is a use if "the candidate's personal appearance(s) is substantial in length, integrally involved in the program, and indeed the focus of the program, and where the program is under the control and direction of the candidate."

*1978 Political Broadcasting Primer,* 69 F.C.C.2d at 2245 (emphasis in original). If, as the Commission urges in support of its conclusion that teletext is exempt from section 315, the teletext services were utterly incapable of a "use" thus defined, we

might still doubt the rationality of a conclusion that one could not "use" teletext under section 315. Defining a "use" as a personal appearance by "voice or picture" suggests an approach under which the Commission defines "use" according to the qualities of the medium being used. In the case of traditional broadcasting, that "use" took on an audio-visual character consistent with that of the medium. Given the textual nature of teletext, it appears to be an unexplained departure from the Commission's past practice for it not to redefine "use" to account for the nature of the new medium. Such a redefinition would allow for "use" of teletext broadcasting when there was transmission of personal statements, reprints of speeches, policy papers by the candidate, and the like. These represent clear examples of a candidate's making personal use of the teletext broadcasting medium and appear to fall within the meaning of section 315. At a minimum, the Commission would have to address whether the existence of personal "textual uses" of teletext might necessarily follow from the Commission's previous treatment of "uses" and then either redefine "use" to include such a situation or explain why it feels it can reasonably refuse to do so under the statutory scheme.

We also have a more particular objection to the Commission's reasoning. The Commission asserted that a "use" was not possible because teletext could not reproduce a "voice or picture" of a candidate. In this, the Commission ignored the fact that teletext is capable of high-resolution graphics and can transmit a recognizable image of a candidate using that capability. The transmission of a "drawing or other pictorial representation" of a candidate, if "identified or identifiable," will satisfy "the requirement for an appearance by voice or picture of a candidate." *Carter/Mondale Reelection Committee, Inc.,* 80 F.C.C.2d 285, 286 (Broadcast Bureau 1980). Thus, even under the current definition, teletext cannot be found utterly incapable of a "use" under section 315. Because the Commission did not acknowledge or in any

way deal with this inconsistent precedent, its ruling cannot be deemed the product of reasoned decisionmaking.

Accordingly, we reverse the Commission's decision with respect to section 315 and remand for further proceedings consistent with this opinion. We now turn to an examination of the Commission's treatment of the fairness doctrine.

## V.

■ The fairness doctrine "provides that broadcasters have certain obligations to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." 47 C.F.R. § 73.1910 (1985). The doctrine arose "under the Commission's power to issue regulations consistent with the 'public interest,' ... [and] imposes two affirmative obligations on the broadcaster: coverage of issues of public importance must be adequate and must fairly reflect differing viewpoints." *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 110–11, 93 S.Ct. 2080, 2090, 36 L.Ed.2d 772 (1973). The basic purpose of the fairness doctrine is to ensure that the American public not be left uninformed. *Green v. FCC,* 447 F.2d 323, 329 (D.C.Cir.1971). In serving this interest, the Commission has emphasized that "the public's need to be informed can best be served through a system in which the individual broadcasters exercise wide journalistic discretion, and in which government's role is limited to a determination of whether the licensee has acted reasonably and in good faith." *Fairness Report,* 48 F.C.C.2d 1, 9 (1974).

In practice, this means that the Commission exercises very limited review of the first part of the doctrine, the obligation to devote an adequate amount of time to the discussion of public issues. Decisions about the quantity of time to devote and the issues selected rest with the licensee. The Commission, in reviewing whether the licensee has provided an adequate amount of public interest programming, limits the inquiry to a "determination of [the] reasonableness" of the sum of the time provided.

*Fairness Report,* 48 F.C.C.2d at 10. With respect to the choice of issues covered, the Commission has, in the past,

> indicated that some issues are so critical or of such great public importance that it would be unreasonable for a licensee to ignore them completely. But such statements on [the Commission's] part are the rare exception, not the rule, and [the Commission does not] ... becom[e] involved in the selection of issues to be discussed, nor ... [does it] expect a broadcaster to cover each and every issue which may arise in his community.

*Id.* (citation omitted).

With respect to the second part of the fairness doctrine obligation, the duty to provide reasonable coverage to discussion of opposing viewpoints, the Commission has also attempted to preserve licensee discretion. In its 1974 *Fairness Report,* the Commission summarized its position as follows:

> When a licensee presents one side of a controversial issue, he is not required to provide a forum for opposing views on that same program or series of programs. He is simply expected to make a provision for the opposing views in his *overall programming.* Further, there is no requirement that any precisely equal balance of views be achieved, and all matters concerning the particular opposing views to be presented and the appropriate spokesman and format for their presentation are left to the licensee's good discretion subject only to a standard of reasonableness and good faith.

48 F.C.C.2d at 8 (emphasis in original). The reasonableness of the balance depends on a variety of factors, including such considerations as the amount of time afforded each side, the frequency of presentation of each side's position, and the size of the audiences of such presentations. *Id.* at 17.

The FCC in the teletext docket decided to exempt that service entirely from the requirements of the fairness doctrine. The Commission premised its decision on the fact that Congress never actually codified the Commission's fairness doctrine, and

that the Commission, therefore, had no obligation to extend its own policy to new services like teletext. Petitioners dispute this interpretation, arguing that the fairness doctrine "is a statutory obligation that requires *all* broadcasting services to provide reasonable opportunities for the presentation of contrasting viewpoints on controversial matters of public importance." Brief for TRAC/MAP at 34–35 (emphasis in original). Because teletext constitutes broadcasting under the terms of the statute, petitioners argue that the fairness doctrine must be applied. *Id.* at 37.

We begin our analysis by reciting the classic formulation of the fairness doctrine:

> The Commission has ... recognized the necessity for licensees to devote a reasonable percentage of their broadcast time to the presentation of news and programs devoted to the consideration and discussion of public issues of interest in the community served by the particular station. And we have recognized, with respect to such programs, the paramount right of the public in a free society to be informed and to have presented to it for acceptance or rejection the different attitudes and viewpoints concerning these vital and often controversial issues which are held by the various groups which make up the community.

*Editorializing by Broadcast Licensees*, 13 F.C.C. 1246, 1249 (1949). Thus, the fairness doctrine imposes obligations on "licensees" in the use of their "broadcast time." Teletext is broadcast time operated by Commission licensees or by lessees under the control of licensees. We find it clear, therefore, that the fairness doctrine by its terms applies to teletext; no extension is necessary. Indeed, it appears an affirmative departure from precedent for the Commission to say that a licensee's fairness obligations apply only to a part of its broadcast time. Thus, we must examine whether the doctrine amounts to a statutory obligation preclusive of the Commission's making such a departure, and, if not, whether the Commission adequately explained its change in policy.

The dispute about whether the fairness doctrine is a statutory obligation or a Commission policy centers around a 1959 amendment to section 315 of the Communications Act of 1934. Congress amended section 315(a) explicitly to exclude from the definition of "use of a broadcasting station" such programming as bona fide newscasts, bona fide news interviews, bona fide news documentaries, and on-the-spot coverage of bona fide news events. *See* Pub.L. No. 86–274, 73 Stat. 557 (1959). Alongside the insertion of this change in the statute, Congress also added the following language to section 315(a):

> Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed on them under this Act to operate in the public interest and to afford reasonable opportunity for the presentation of conflicting views on issues of public importance.

47 U.S.C. § 315(a) (1982). *See also* Pub.L. No. 86–274, 73 Stat. 557 (1959). Petitioners suggest that we must treat this passage as a codification of the fairness doctrine as applied at the time of the 1959 amendment and that the Commission, therefore, may not alter the fairness obligation, even if it believes such a change to be required in the public interest. We disagree.

We do not believe that language adopted in 1959 made the fairness doctrine a binding statutory obligation; rather, it ratified the Commission's longstanding position that the public interest standard authorizes the fairness doctrine. The language, by its plain import, neither creates nor imposes any obligation, but seeks to make it clear that the statutory amendment does not affect the fairness doctrine obligation as the Commission had previously applied it. The words employed by Congress also demonstrate that the obligation recognized and preserved was an administrative construction, not a binding statutory directive. Congress described the obligation to which

it addressed its admonition as one "imposed ... *under the Act*," 47 U.S.C. § 315(a) (1982) (emphasis added), not by the Act. This suggests that Congress viewed the doctrine as an obligation promulgated pursuant to authority conferred under the Act, specifically, the public interest mandate, and not as a fixed requirement frozen in place by the Act. Thus, by its 1959 amendment, "Congress ... expressly accepted ... that the public interest language of the Act authorized the Commission to require licensees to use their stations for discussion of public issues, and that the FCC is free to implement this requirement by reasonable rules and regulations." *Red Lion*, 395 U.S. at 382, 89 S.Ct. at 1802. "In other words, the amendment vindicated the FCC's general view that the Fairness Doctrine inhered in the public interest standard." *Id.* at 380, 89 S.Ct. at 1801.

■ Because the fairness doctrine derives from the mandate to serve the public interest, the Commission is not bound to adhere to a view of the fairness doctrine that covers teletext. "An agency's view of what is in the public interest may change, either with or without a change in circumstances." *Greater Boston Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970) (footnote omitted), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). To the extent that the Commission's exemption of teletext amounts to a change in its view of what the public interest requires, however, the Commission has an obligation to acknowledge and justify that change in order to satisfy the demands of reasoned decisionmaking. *See id.; see also International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. NLRB*, 459 F.2d 1329, 1341 (D.C.Cir.1972) ("It is an elementary tenet of administrative law that an agency must either conform to its own precedents or explain its departure from them.").

The Commission has offered two justifications for its refusal to apply the fairness doctrine to teletext. First, the Commission relies on its theory about the textual nature of teletext and the first amendment

implications flowing from this distinction between teletext and other, more traditional modes of broadcasting. As we have already discussed, *see supra* pp. 506–509, however, the Supreme Court has drawn a different line so that the Commission can gain no constitutional support for the disparity in regulation between teletext and traditional broadcasting.

The second justification is more substantial. The Commission decided, and petitioners have not disputed, that the burdens of applying the fairness doctrine might well impede the development of the new technology and that "the likelihood of licensees' embarking upon ... endeavors [like teletext] will be substantially affected" by the agency's policy. *Report and Order*, 53 Rad.Reg.2d (P & F) at 1324. Accordingly, the Commission explicitly concluded that "the public interest is better served by not subjecting teletext to Fairness Doctrine obligations." *Id.*

We believe the Commission acted rationally in so concluding. Petitioners have not challenged the Commission's assertions about the negative impact the application of the fairness doctrine would have upon the development of teletext. Moreover, the Commission's view that encouragement of new technologies serves the public interest is not only rational, but is explicit in the Communications Act of 1934. *See* 47 U.S.C. § 303(g) (1982). In effect, the Commission posited an absence of fairness doctrine burdens and made predictions about the marginal encouragement to the development of teletext and the marginal diminution, if any, in the presentation of opposing viewpoints on controversial matters of public importance. In weighing the public interest implications of the two marginal effects, the Commission concluded that the balance favored forbearance from applying the fairness doctrine, and, absent a showing, not even attempted here, that this conclusion was arbitrary and capricious, we cannot disturb the Commission's decision on this point. Accordingly, with respect to the fairness doctrine, we affirm the decision of the Commission.

To summarize: we reverse and remand the Commission's decision for further proceedings consistent with this opinion as it concerns section 315 of the Communications Act of 1934, and we affirm the Commission's decision with respect to section 312(a)(7) and the fairness doctrine.

*It is so ordered.*

MacKINNON, Senior Circuit Judge (concurring in part and dissenting in part).

I concur in parts II and IV of Judge Bork's opinion but dissent with respect to parts III and V. I would thus allow reasonable access to teletext by legally qualified candidates for federal elected office on behalf of their candidacies. I would also hold that the fairness doctrine is applicable. This would require teletext operators to afford reasonable opportunity for the discussion of conflicting views on issues of public importance. In my opinion this would not impede the development of teletext.