**FELIX v. WESTINGHOUSE RADIO STATIONS, Inc.**

**FELIX v. TRIANGLE PUBLICA-TIONS, Inc.**

**FELIX v. WCAU, Inc.**

Nos. 10206, 10222, 10223.

United States Court of Appeals,
Third Circuit.

Argued Nov. 13, 1950.

Decided Dec. 20, 1950.

Rehearing Denied Jan. 25, 1951.

Thomas D. McBride, Philadelphia, Pa.,
for appellant.

Walter Biddle Saul, Philadelphia, Pa.
(Allen S. Olmsted, 2nd, Philadelphia, Pa.,
on the brief), for Westinghouse Radio
Stations, Inc.

Harold Kohn, Philadelphia, Pa. (Aaron
M. Fine, Philadelphia, Pa., on the brief),
for Triangle Publications, Inc.

Robert F. Irwin, Jr., Philadelphia, Pa.
(George M. Kevlin, Philadelphia, Pa., on
the brief), for WCAU, Inc.

Before MARIS, McLAUGHLIN and
STALEY, Circuit Judges.

MARIS, Circuit Judge.

These are appeals from summary judg-
ments entered by the United States District
Court for the Eastern District of Pennsyl-
vania in favor of the defendants in three
civil actions for defamation. There is no
dispute as to the facts. It appears that in
October, 1949 in the course of a political
campaign in the City of Philadelphia for

the election of municipal officers, William F. Meade, chairman of the Republican Central Campaign Committee, broadcast two radio speeches over the defendants' radio stations. His theme was that the Democratic party in Philadelphia, and particularly its candidate for city treasurer, was supported and more or less controlled by a communist group. The plaintiff, who was not a candidate for office at the election, was named as one of the group in a context which, for the purposes of its decision, the district court assumed to be libelous. We make the like assumption for the purposes of these appeals.

In the preceding August the defendants had offered radio time to be used for political broadcasts for candidates in the November election to the respective chairmen of the Republican and Democratic campaign committees on a basis of equal time to each. It was stipulated in the district court that the Republican party candidates for the offices of city controller, city treasurer, register of wills and coroner authorized the Republican Central Campaign Committee and its chairman, Meade, to campaign for their election, and, as part of the campaign to contract for the rental of radio facilities and to use defendants' broadcasting stations. It is also undisputed that Meade's speeches were made in time contracted for by the committee in pursuance of such authorization.

A few minutes before each broadcast by defendant Westinghouse Radio Stations, Inc., Meade delivered to that defendant a typewritten copy of the speech. The speeches were thereafter broadcast without change and electrically transcribed. The speeches thus broadcast and transcribed by Westinghouse were subsequently re-broadcast by defendants, WCAU, Inc., and Triangle Publications, Inc. These two defendants were in each case warned by the plaintiff personally in advance not to re-broadcast the speeches but they nonetheless did so. Concluding that upon these facts the defendants were not liable to the plaintiff by virtue of Meade's speeches, the district court entered the summary judgments

in their favor from which the present appeals were taken. 89 F.Supp. 740.

The conclusion which the district court reached was based upon the construction which it placed upon Section 315 of the Communications Act of 1934. That section is as follows: "If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station, and the Commission shall make rules and regulations to carry this provision into effect: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is hereby imposed upon any licensee to allow the use of its station by any such candidate." [1]

It was the view of the district court that the language of Section 315 must be construed to comprehend the use of a broadcasting station not only by a candidate personally but also by others authorized to speak in his interest and on his behalf. Based upon this premise the court held that Section 315 prohibited the defendants from censoring the speeches which were delivered over their facilities by Meade on behalf of the candidates. Having thus decided that the defendants were prohibited by Section 315 from censoring those speeches the court reasoned that they were without fault in broadcasting them. Since under the law of Pennsylvania the owner of a broadcasting station has been held not to be liable in damages for libellous statements broadcast over his station in the absence of fault on his part, the court concluded that the defendants could not be held liable by the plaintiff.

We are unable to assent to the conclusion thus reached by the district court for the reason that we cannot agree with the premise upon which it is based. For we do not think that Section 315 of the Communications Act of 1934 may be given the construction which the district court has here placed upon it. On the contrary

1. Act of June 19, 1934, ch. 652, § 315, 48 Stat. 1088, 47 U.S.C.A. § 315.

the language of the section itself and its legislative history compel the conclusion that the section applies only to the use of a broadcasting station by a candidate personally and that it does not apply to the use of such a station by other persons speaking in the interest or support of a candidate.

The significant language of Section 315 is that if a licensee "shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station". The use referred to is, of course, the broadcasting of speeches to the voting public. It will be observed that the section speaks only of such use by candidates. It is wholly silent as to the use of broadcasting facilities by supporters of candidates.

The district court, however, thought that as a matter of public policy the provisions of Section 315 relating to the use of broadcasting stations by candidates should be construed broadly so as to include not only broadcasts by the candidates themselves but also by their supporters. We are quite willing to concede that there are strong reasons for advocating such a broad construction. When we turn to the legislative history of Section 315, however, we find that this very question of including supporters of candidates within the purview of that section has been specifically considered and rejected by the Congress, which has made it perfectly clear that the section is intended to apply only to the personal use of broadcasting facilities by the candidates themselves.

The Communications Act of 1934, of which Section 315 is a part, repealed and replaced the Radio Act of 1927.[2] Section 315 is identical with Section 18 of the prior act. The Radio Act of 1927 originated in the House of Representatives.[3] As passed by that House it contained no provisions similar to those now incorporated in Section 315. Those provisions had their origin in an amendment made to the bill when it

was under consideration in the Senate. The amendment was proposed by Senator Dill, Chairman of the Committee on Interstate Commerce, who was in charge of the bill on the floor of the Senate. It was offered by him as a substitute for a proposed committee amendment which would have prohibited discrimination by licensees of broadcasting stations with regard to political candidates and the discussion of public questions and which provided that such licensees should be deemed common carriers in interstate commerce. Senator Dill's substitute amendment provided: "If any licensee shall permit a broadcasting station to be used by a candidate or candidates for any public office, he shall afford equal opportunities to all candidates for such public office in the use of such broadcasting station: *Provided,* That such licensee shall have no power to censor the material broadcast under the provisions of this paragraph and shall not be liable to criminal or civil action by reason of any uncensored utterances thus broadcast."[4]

In discussing this amendment on the floor of the Senate, Senator Dill said:

"There is the difference that under the common-carrier provision the radio station is compelled to take any kind of broadcasting that anybody wants to offer, which would mean that it would take anybody who came in order of the person presenting himself and would be compelled to broadcast for an hour's time speeches of any kind they wanted to broadcast. This provision simply says that if a radio station permits one candidate for a public office to address the listeners it must allow all candidates for that public office to do so, and to that extent there must be no discrimination. * * *

* * * * * *

"If it permits one candidate—but it need not permit any candidate. In other words, a station may refuse to allow any candidate to broadcast; but if it allows one candidate for governor to broadcast, then all the candidates for governor must have an equal

2. Act of February 23, 1927, ch. 169, 44 Stat. 1162.

3. H.R. 9971, 69th Cong. 1st Sess.
4. 67 Cong. Rec. 12501.

right; but it is not required to allow any candidate to broadcast.

\* \* \* \* \* \*

" \* \* \* Under the House bills they can allow one man to speak and forbid everybody else to speak. I felt that was not the proper thing. If a station permitted a candidate for Congress to broadcast, then other candidates for Congress should have an equal right.

\* \* \* \* \* \*

"The amendment only provides for candidates for political offices. If a candidate wanted to speak on that subject as to his candidacy, then he could deliver such a speech." [5]

Following this discussion Senator Dill's amendment was adopted and the bill as amended subsequently passed the Senate. In conference between the two Houses the provisions of Section 18, now incorporated verbatim in Section 315 of the Communications Act of 1934, were agreed to. In the statement of the conferees on the part of the House it was said: "Section 18 was not embodied in the House Bill. It is a modification of one of the sections of the Senate amendment. It provides in substance that if any licensee shall permit a legally qualified candidate for public office to use a broadcasting station the licensee shall afford equal opportunities to all other candidates for the same office to use the station." [6]

There were subsequent attempts by the Congress to broaden these provisions so as to include supporters of candidates as well as the candidates themselves. Thus in the 72d Congress a bill, H.R. 7716, to amend the Radio Act of 1927 was passed by both Houses. The bill as passed by the House

proposed no change in Section 18 of the act. In the Senate, however, a new section was added upon the recommendation of the Senate Committee on Interstate Commerce [7] which amended Section 18 of the Radio Act of 1927 so as to read as follows:

"Section 18(a). If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such station; and if any licensee shall permit any person to use a broadcasting station in support of or in opposition to any candidate for public office, or in the presentation of views on a public question to be voted upon at any election, or by a government agency, he shall afford equal opportunity to an equal number of other persons to use such station in support of an opposing candidate for such public office, or to reply to a person who has used such broadcasting station in support of or in opposition to a candidate, or for the presentation of opposite views on such public question.

"(b) The commission shall make rules and regulations to carry this paragraph into effect. No such licensee shall exercise censorship over any material broadcast in accordance with the provisions of this section. No obligation is imposed upon any licensee to allow the use of his station by any candidate, or in support of or in opposition to any candidate, or for the presentation of views on any side of the public question.

"(c) The rates charged for the use of any station for any of the purposes set forth in this section shall not exceed the regular rates charged for the use of said station to advertisers furnishing regular

5. 67 Cong. Rec. 12502.

6. 68 Cong. Rec. 2589.

7. The committee made the following explanation of this amendment:
   "The purpose of this amendment is to extend the requirement of equality of treatment of political candidates to supporters and opponents of candidates, and public questions before the people for a vote. It also prohibits any increased charge for political speeches.

   "No station owner is required to permit the use of his station for any of these purposes, but if a station permits one candidate or the supporters or opponents of a candidate, or of a public question upon which the people are to vote, then the requirement of equality of treatment. and of no higher rates than the ordinary advertising rates shall be charged."
   S.Rept.No.564, 72d Cong. 1st Sess., p. 10.

programs, and shall not be discriminatory as between persons using the station for such purposes." [8]

In conference this amendment was accepted by the House, the report of the House conferees stating: "This amendment broadens Section 18 of the radio act of 1927, generally referred to as the 'political section' designed to insure equality of treatment to candidates for public office, those speaking in support of or in opposition to any candidate for public office, or in the presentation of views on public questions." [9]

The bill thus agreed to by both Houses was the subject of a pocket veto by the President, however, and, therefore, did not become law.

It was in the next Congress that the bill [10] which became the Communications Act of 1934 was introduced. Section 315 of that bill as reported by the Senate Committee on Interstate Commerce was identical with the proposed amendment of Section 18 of the Radio Act of 1927 which had been contained in the bill passed by the preceding Congress and subjected to a pocket veto, which amendment we have quoted above. In the report of the Senate committee the following statement was made with respect to the proposed Section 315: [11] "This section extends the requirement of equality of treatment of political candidates to supporters and opponents of candidates, and public questions before the people for a vote. It also prohibits any increased charge for political speeches. No station owner is required to permit the use of his station for any of these purposes but if a station permits one candidate or the supporters or opponents of a candidate, or of a public question upon which the people are to vote, to use its facilities, then there is the requirement of equality of treatment and that no higher rates than ordinary advertising rates shall be charged."

The bill was passed by the Senate in this form but in the House of Representatives Section 315 of the Senate bill was stricken out. This would have resulted in continuing in force Section 18 of the Radio Act of 1927. In conference between the two Houses it was agreed that Section 315 should be included in the bill but should be amended so as to conform exactly with the existing provisions of Section 18. This was in line with the decision of the conferees to accede to the desire of the Senate to repeal the Radio Act of 1927 in toto and to cover the whole field in the new act. The report of the House conferees stated with respect to Section 315: "Section 315 on facilities for candidates for public office is the same as section 18 of the Radio Act. The Senate provisions, which would have modified and extended the present law, is not included in the substitute." [12]

In this form the bill passed finally and upon its approval by the President became the Communications Act of 1934.

We have recounted the foregoing legislative history in some detail in order to make it perfectly plain that the Congress understood when in 1934 it enacted Section 315 of the Communications Act that the provisions of that section, which were identical with those of Section 18 of the prior act, applied only to the personal use of radio facilities by the candidates themselves, the House of Representatives having definitely rejected the attempt on the part of the Senate to extend those provisions to include supporters and opponents of candidates as well as the candidates themselves. It is seldom that the legislative history of a statutory enactment so clearly discloses the intention of the Congress with respect to a provision which otherwise might be regarded as ambiguous. For the two Houses of Congress differed on the very question which we have here to decide and the Senate, which favored the broader section, was compelled to give way and accept the narrower section insisted upon by the House of Representatives. All of this legislative history would be reduced to

8.  76 Cong. Rec. 3768.

9.  76 Cong. Rec. 5038.

10.  S. 3285, 73d Cong., 2d Sess.

11.  S.Rept.No.781, 73d Cong., 2d Sess., p. 8.

12.  78 Cong. Rec. 10988.

wholly meaningless shadow boxing if it were the fact that the language of Section 18 of the Radio Act of 1927 as originally enacted included the supporters of candidates as well as the candidates themselves. We must accordingly take the statute as the Congress intended it to be and leave it to that body to resolve the questions of public policy involved in the one construction or the other.

 Since Section 315 applies only to the use of a radio station by a candidate himself and not to such use by his supporters it follows that the section did not prohibit the defendants from censoring Meade's speeches. The defendants are, therefore, not entitled to assert the defense that they are not liable because the speeches could not have been censored without violating Section 315 and that accordingly they were not at fault in permitting the speeches to be broadcast. Accordingly it was error for the district court to enter summary judgments in their favor upon this ground.

The judgments of the district court will be reversed and the causes will be remanded for further proceedings.