HIRAM MALDONADO y ELIZABETH NEGRÓN SASTRE, demandantes y peticionarios, *v.* ENRIQUE MARRERO PADILLA e ING. WILFREDO BLANCO PI, demandados y recurridos.

*Número:* CE-88-121 *Resuelto:* 21 de junio de 1988

706

708

*Carlos E. Rodríguez Quesada*, abogado de los peticionarios; *Luis A. Lugo, Jr.*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

## I

Ángel M. Rosario, Alcalde de Morovis —y candidato a reelección a dicho cargo por el Partido Popular Democrático (P.P.D.) para los comicios de 1984— mediante paga, contrató tiempo de transmisión en la emisora radial WGFE para difundir dos (2) programas políticos de una (1) hora los días 30 de septiembre y 7 de octubre de 1982. Esta emisora, localizada en Morovis, es propiedad del Ing. Wilfredo Blanco Pi. Su señal, además de Morovis, cubre Ciales, Manatí, Vega Baja, Vega Alta y Corozal.

A dichos programas el Alcalde Rosario invitó a varias personas, entre ellos, Enrique Marrero Padilla. Este último se desempeñaba como Trabajador Social en el Sistema de Instrucción Pública de Morovis. Había competido para el puesto de Director de la Escuela Intermedia local contra Hiram Maldonado Soto, quien el 2 de agosto de 1982 resultó nombrado.

En las transmisiones aludidas, Marrero Padilla insinuó y acusó a Maldonado Soto de haberse robado, como aspirante, el examen requerido por el Departamento de Instrucción Pública para los aspirantes al cargo de Director de Escuela Intermedia.(1)

---

(1) Según estipulado, en lo pertinente, las primeras declaraciones fueron las siguientes:

"Buenas tardes pueblo de Morovis, maestro de Instrucción Pública del pueblo de Morovis. No vengo a improvisar discursos que no los hiciera cualquier político del PPD, o me hiciera Eddie Padilla, vengo a denunciar la prostitución del sistema de Instrucción Pública y la degradación de la casa de estudio de Puerto Rico; el Departamento de Instrucción Pública. Tengo en mis manos evidencia contundente para sacar de carrera a Eddie Padilla.

"Se han violado los derechos laborales de un profesional porque Eddie Padilla quería . . . . Tenía que premiar a Pichu Pichu, [se refiere a Hiram Maldonado Soto], que era su l[í]der, alza cola y asecuaz [sic], que le seguía como un perro faldero y no tenía los requisitos para ocupar la plaza de Director Escolar.

"Pichu Pichu tomaste los exámenes de ascenso seis (6) veces y no los pasaste.

Como resultado, Maldonado y su esposa Elizabeth Negrón Sastre presentaron en el Tribunal Superior, Sala de Arecibo, una demanda por difamación de información falsa y

---

"Pichu Pichu no era elegible para la certificación porque no tenía los sesenta (60) puntos que requería la certificación. . . . Farahones de la mentira . . . insolentes.

"Cuando llegó la certificación estaba Pichu Pichu. Públicamente se lo dije que no tenía derecho de estar allí.

"Eddie Padilla lo llevó allí. *Se robó el examen y la clave del examen de ascenso que la tengo aquí en mis manos.*

"*Se lo robaron y se lo entregan* y es tan bruto que no pasó el examen. Es tan bruto que a la hora del examen me da la evidencia y tenía la clave.

"Miren qu[é] l[í]der, qu[é] clase de ciudadano, profesores de escuela intermedia, siendo supervisados por un ciudadano que tiene menos [s]esos que la gata de mi casa.

"Eddie Padilla ha usado su dedo y la Secretaria de Instrucción Pública no puede con . . . .

"Maestros me da pena con ustedes que están siendo supervisados por un politiquero que no tiene interés en la educación.

"No me gradué con 'Raspa' Cum Laude como Hiram. . . .

"Eddie Padilla, Rogelio Maldonado, Hiram y la Secretaria de Instrucción Pública están envueltos en un Water Gate más grande y peor que el que estuvo Nixon. . . .

"*No creí que Hiram bajara tan bajo. No me robé los exámenes y me los copié como se los robó Hiram Maldonado.*

"Señores, hago pública mi denuncia para que reeval[ú]en. Eddie e Hiram, farahones de la mentira . . . . Han prostitu[i]do el sistema de Instrucción Pública . . . le han dado la clave y le han borrado las contestaciones . . . yo tengo la evidencia aquí.

"Si Eddie Padilla y Pichu Pichu se averg[ü]enzan deben abandonar este pueblo.

"La Secretaria de Instrucción Pública no puede . . . . "Vamos a acabar con Eddie Padilla y Pichu Pichu que es un parásito de Eddie, y cuando una persona tiene que depender de otro es un parásito social, y eso lo sabe Pichu Pichu si es que se ha leído los manuales de psicología y sociología.

"Estos dos (2) señores han prostitu[i]do la casa de estudio y si han violado ésto, son capaces de violar los postulados de la Biblia y hacer una Biblia nueva.

"*Eddie e Hiram se robaron los exámenes* y por eso Hiram responde a Eddie.

"El hecho de Hiram prohibirle a los empleados del comedor que entren con carteras . . . eso es en su incapacidad administrativa, porque él no está preparado para ocupar esa posición y cuando una persona tiene habilidad y se ha llevado hasta los clavos . . . y ha llegado a falsificar . . . *y a robarse los exámenes de ascenso, pues nadie puede ser más pillo que él.* [É]l vela alguna que otra que se

maliciosa contra Marrero Padilla y Blanco Pi. Reclamaron el pago solidario de $300,000 en concepto de daños por angustias físicas y mentales. Ambos demandados negaron responsabilidad. Subsiguientemente, el tribunal rehusó de forma sumaria desestimar la demanda. Luego de ciertos trámites de rigor, celebró la vista en su fondo. A base de la prueba desfilada por los demandantes aquí peticionarios Maldonado-Negrón, dicho foro, al amparo de la Regla 39.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dictó sentencia *parcial* y declaró sin lugar la demanda en cuanto a Blanco Pi.[2]

En esencia, el foro de origen concluyó que Maldonado Soto, por su condición de director de la escuela antes mencionada, "es un funcionario público, así como una figura pública en la comunidad cubierto con la inmunidad relativa que le da la malicia real, por lo que no puede ser indemnizado por

---

pueda llevar un platanito cuando él se ha llevado el examen de ascenso. . . . *Porque el pillo, sabe cuando el otro está robando.*

 . . . . . .

"Esa es su incapacidad profesional por responder a un l[í]der político.

"Su récord es ineficiente, es un mogollero, como maestro fue ineficiente, es uno de los peores maestros de Morovis. . . . Ahora quieren practicar la moral en ropas interiores con los empleados. Cuando se ha caído tan bajo y quieren levantarse tienen que irse lejos. Esta es la situación de Hiram. Creen que al pueblo se le puede engañar." (Énfasis suplido.) Anejo I, págs. 2–3.

En el próximo programa, el 7 de octubre expuso:

"Quiero dar un cordial saludo a todos los maestros y amigos del pueblo de Morovis, y a mis hermanos que no tengan miedo, que si se matan, etc. . . .

"Que si me meten a la cárcel los PNP me hacen un héroe y hasta speaker de la Cámara y ellos no quieren eso para mí. . . .

"Eddie Padilla y Pichu Pichu los quiero juntos en la papeleta del PNP porque ustedes con el dedo se han hecho presidente y vice-presidente del PNP y tienen todas las posiciones en sus manos. . . .

"Hiram reuniste tus maestros y le dijiste que tú eras inteligente, pero no le dijiste a tus maestros c[ó]mo *te robaste los exámenes de ascenso del gobierno.* . . ." (Énfasis suplido.) Anejo I, págs. 3–4.

(2) Respecto a Marrero Padilla, se negó a desestimar. Dejó pendiente de ulterior adjudicación su responsabilidad, "ya que éste admitió haber hecho las acusaciones y expresiones radiodifundidas y su defensa está basada en que las mismas son ciertas, por lo tanto viene obligado a presentar su prueba para demostrar la veracidad de las mismas". Anejo I, pág. 37.

daños a su reputación, a menos que demuestre que la publicación se efectuó con malicia real, a sabiendas de que era falsa o con grave menosprecio de si era falsa o no, ésta tiene que ser probada afirmativamente". Anejo I, pág. 34. Fundó su determinación en dos (2) circunstancias. La primera, que éste, como director escolar, "administra y supervisa la operación y gestión de todo el personal docente de la misma y tiene la responsabilidad de que se imparta a los estudiantes, una educación de calidad dentro de los parámetros establecidos por el Departamento de Instrucción Pública". Anejo I, pág. 30. Y la segunda, que según su propio testimonio Maldonado Soto, "por alrededor de un año sirvió de *moderador, presentador y maestro de ceremonias en un programa de orientación política [del Partido Nuevo Progresista (P.N.P.)] por la emisora [WKCK] Radio Cumbre de Orocovis* y que participaba en asuntos *electorales* de la comunidad". (Énfasis suplido.) Anejo I, págs. 32–33. Entre éstos, cabe destacarse que la prueba reveló que fue Presidente de Barrio por el P.N.P. y, además, desde marzo de 1982 su Vicepresidente en la municipalidad de Morovis.

En lo concerniente a la intervención de Blanco Pi en las transmisiones radiales, el foro de instancia concluyó que una vez advertido del contenido de la primera transmisión por su empleado Edwin Montesinos, aquél le indicó que —dada la naturaleza y orientación política del programa— no podía controlarlo. Posteriormente, a solicitud de Maldonado Soto, Blanco Pi le ofreció tiempo igual con sujeción a los reglamentos de la Comisión Federal de Comunicaciones y se reiteró en que no podía ejercer la función de censor sobre material a ser radiodifundido en programas políticos.

Inconformes, a solicitud de los esposos Maldonado-Negrón, mediante trámite de mostrar causa evaluamos sus seis (6) señalamientos de error, que verdaderamente se reducen a impugnar la conclusión de figura pública, la desestimación

decretada, más la imposición de las costas y $500 de honorarios.

## II

Primeramente, los peticionarios Maldonado-Negrón cuestionan la conclusión de que Maldonado Soto era, para propósitos de exigirle prueba sobre malicia real, un funcionario y figura pública.

■ Esencialmente, el planteamiento conlleva armonizar el perenne conflicto entre dos (2) importantes valores comunitarios de abolengo constitucional: la libertad de expresión-prensa frente a la protección contra ataques abusivos a la honra y reputación de las personas. *Clavell v. El Vocero de P.R.*, 115 D.P.R. 685, 691 (1984). La colisión, que no es nueva, ha dado génesis a una normativa jurisprudencial modificatoria de la visión de los requisitos clásicos en acciones por difamación en el orden civil. Únicamente así ha sido posible considerar y proteger los derechos individuales y la libertad de expresión-prensa.

■ El fundamento en que se afirma nuestra doctrina vigente es un reflejo directo de las declaraciones del más alto Foro federal en *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280 (1964), respecto a que no es "difamatoria la publicación de un informe falso o de comentarios injustificados concernientes a la *conducta oficial* de un *funcionario público*, a menos que la información fuera publicada maliciosamente, esto es, *a sabiendas de que era falsa o con grave menosprecio de si era falsa o no*". (Traducción y énfasis nuestros.) Este pronunciamiento tuvo el efecto dual de *promover* el debate robusto y abierto sobre controversias públicas y, a la par, fomentar la discusión, con igual anchura, en torno a aquellas personas que están en *posiciones significativas de influenciar la solución de tales controversias. New*

*York Times Co. v. Sullivan*, supra, pág. 279. Aunque en *New York Times Co. v. Sullivan*, supra, en buena metodología adjudicativa no se fijaron —a modo de inventario— los niveles jerárquicos comprendidos en la designación de "funcionario público" para propósitos de malicia real, su ensamblaje decisorio sirvió de apoyo al siguiente lenguaje orientador plasmado posteriormente en *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966):

> Cuando una posición gubernamental posee tal importancia aparente que el público tiene un interés independiente en las cualificaciones y ejecutorias del servidor público concernido, más allá del interés general en las condiciones y labor de todos los empleados gubernamentales . . . se aplican los estándares de *New York Times* sobre malicia. (Traducción nuestra.)

■ Esta expresión ha sido objeto de dilatada interpretación judicial. Hoy día un gran número de empleados públicos, de distintos niveles, son considerados "funcionarios públicos" y, por ende, sujetos al requisito de malicia real en el ámbito de una acción por difamación. L.H. Tribe, *American Constitucional Law*, 2da ed. rev., Nueva York, Ed. The Foundation Press, 1988, págs. 865–866; J.D. Eaton, *The American Law of Defamation Through "Gertz v. Robert Welch, Inc." and Beyond: An Analytical Primer*, 61 Va. L. Rev. 1349, 1377 escs. 20–21 (1975); *Adams v. Frontier Broadcasting Company*, 555 P.2d 556, 560–561 esc. 4 (1976); Anotación, *Libel and Slander: Who is a Public Official or Otherwise Within the Federal Constitutional Rule Requiring Public Officials to Show Actual Malice*, 19 A.L.R.3d 1361 (1968).

■ Igualmente espaciosa ha sido la glosa jurisprudencial sobre "conducta oficial". Tribe, *op. cit.*, pág. 864. Sobre el particular, *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964), es ejemplarizante:

> Ciertamente, cualquier crítica sobre la manera en que un funcionario público desempeña sus deberes puede afectarle no

sólo su reputación privada, sino la pública. La regla de *New York Times* no es inaplicable meramente porque la reputación privada de un oficial público, así como su reputación pública, resulte lesionada. La regla protege el trascendental interés público de mantener el libre flujo de información al pueblo en torno a los funcionarios públicos, sus servidores. *Con tal propósito, cualquier extremo que pueda relacionarse con la idoneidad del oficial para ocupar el puesto, es relevante.* Pocos atributos personales son más germanos para la idoneidad de un puesto público que la deshonestidad, venalidad o motivaciones impropias, aunque estas características puedan afectar también su carácter privado. (Traducción y énfasis nuestros).

Véanse, también, *Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971); *Oscala Star-Banner Co. v. Damron*, 401 U.S. 295 (1971).

 Esta normativa ha sido incorporada a nuestro acervo doctrinal. A tal efecto, recientemente en *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 61–62 (1988), examinamos los elementos configurativos de una causa de acción por libelo —extendibles a una por difamación— y consignamos:

[D]ebe probarse que la información difamatoria *sea falsa* y que se causaron unos daños reales. Si se trata de una figura privada, es menester establecer que la imputación fue hecha *negligentemente*, según este concepto es entendido en el campo de derecho de daños y perjuicios. *Oliveras v. Paniagua Diez*, 115 D.P.R. 257 (1984). Ahora bien, si se trata de un funcionario público o figura pública —*Aponte Martínez v. Lugo*, 100 D.P.R. 282, 293 (1971); *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415, 422 (1977); *García Cruz v. El Mundo, Inc.*, 108 D.P.R. 174 (1978); *Pueblo v. Olivero Rodríguez*, 112 D.P.R. 369 (1982)— es necesario, además, demostrar la *existencia de malicia real*, esto es, que las imputaciones fueron realizadas con un grave menosprecio por la verdad. *Soc. de Gananciales v. López*, 116 D.P.R. 112 (1984); *Oliveras v. Paniagua Diez*, supra; *García Cruz v. El Mundo, Inc.*, supra; *Zequeira Blanco v. El Mundo, Inc.*, 106 D.P.R. 432 (1977). (Énfasis en el original.)

■ Para determinar si el actor es una figura pública, en *Ocasio v. Alcalde Mun. de Maunabo*, supra, págs. 62–63, también reafirmamos:

[E]l enfoque funcional comenzado en *Torres Silva v. El Mundo, Inc.*, supra. En esa misión siempre hemos balanceado los intereses y considerado como eje crítico la importancia e interés público del asunto en controversia. *Zequeira Blanco v. El Mundo, Inc.*, supra. En *García Cruz v. El Mundo, Inc.*, supra, pág. 180, sostuvimos que la información con relación a la conducta del allí demandante durante "el período en que aspiró al cargo de alcalde representa[ba]n [sic] materia de incuestionable interés público".

En *Pueblo v. Olivero Rodríguez*, supra, pág. 375, al examinar el concepto de figura pública, utilizamos el mismo método evaluativo: el interés público involucrado. Dijimos:

". . . la noción de figura pública está estrechamente vinculada —por razón de la posición oficial, poder o envolvimiento en los asuntos públicos— a la adquisición de relieve, prominencia, fama o notoriedad especial o general en la comunidad que, como corolario, de modo significativo le permite de ordinario a una persona cierto acceso a los medios efectivos de comunicación para exponer, adelantar y debatir sus puntos de vista ante la opinión pública, y como resultado corre el riesgo de estar más expuesta al escrutinio, atención e interés público en contraste con un ciudadano privado."

Un criterio importante en ese análisis fue el factor territorial. "Aunque el concepto tiende a excluir los límites estrechos de un sector exig[u]o de la comunidad —en el caso de autos, en que el único trasfondo es el residencial Manuel A. Pérez— su vigencia es materia de evaluación casuística, cualitativa y cuantitativamente en función de los factores antes esbozados." (Escolios omitidos.) *Pueblo v. Olivero Rodríguez*, supra, págs. 375–376.

En resumen, nos hemos guiado por ciertas consideraciones *funcionales* al determinar si un reclamante es o no figura o funcionario público a los fines de exigir que se pruebe la malicia real por parte del recurrente. (Énfasis en el original y escolio omitido.) Véase, además, *González Martínez v. López*, 118 D.P.R. 190 (1987).

■ Al confrontar este trasfondo jurídico con el fáctico notamos que el tribunal de instancia determinó que Maldonado Soto estaba sujeto al requisito de malicia real bajo dos (2) vertientes: por su condición de funcionario escolar y como figura política activa del P.N.P. Respecto a la primera, no hay duda de la importancia que tiene en nuestro país el sistema educativo. Su establecimiento, a tono con el mandato del Art. II, Sec. 5, Const. E.L.A., L.P.R.A., Tomo 1, responde a la obligación que tiene la sociedad democrática "de proveer para que a las nuevas generaciones se les transmita el conocimiento, los valores, las técnicas, las aptitudes que el continuado esfuerzo de siglos ha traducido en patrimonio de la vida civilizada". 4 Diario de Sesiones de la Asamblea Constituyente 2564 (1961).

■ Ciertamente el puesto de Director de Escuela Intermedia conlleva unos requisitos académicos y profesionales especiales. Los atributos de idoneidad y honestidad personal son inseparables del cargo. Pero es innegable que estos últimos representan cualidades que deben acompañar, igualmente, a todo maestro en la pirámide organizacional del Departamento de Instrucción. En este contexto lato, las manifestaciones referentes a la idoneidad de los incumbentes es materia que reviste interés público y, como tal, susceptible de legítima y libre discusión dentro de una campaña política. Sin embargo, para fines decisorios no es necesario pronunciarnos si el cargo de Director de Escuela Intermedia de Maldonado Soto lo coloca inexorablemente en la categoría de funcionario público.(3)

---

(3) *Cf. Picketing v. Bd. of Education*, 341 U.S. 563 (1968). Véanse: *Kapiloff v. Dunn*, 343 A.2d 251 (1975); Anotación, *Libel and Slander: Actionability of Statements Imputing Inefficiency or Lack of Cualification to Public School Teacher*, 40 A.L.R.3d 490.

▇ Carecemos de todos los elementos de juicio claves en torno a otros factores esenciales. Lo único seguro que aporta la prueba es que su prominencia en Morovis fue producto de haberse involucrado, por años, intensamente en actividades político-partidistas y alcanzado el puesto de Vicepresidente del P.N.P. en dicha municipalidad. Esta realidad no contradicha nos mueve a concluir que su participación en la política constituye la razón principal para situarlo en la dimensión de *figura pública* para fines del requisito de malicia real. Bajo este análisis, no erró el foro de instancia al sostenerlo en la afirmativa.

## III

Aclarado este extremo, exploremos la responsabilidad de Blanco Pi como dueño de la emisora radial WGFE.

▇ Como regla general, la persona natural o jurídica dueña de una emisora radial que difunde por ese medio una manifestación difamatoria está sujeta a una acción en daños, cuya resultancia sufre excepciones. Por analogía conceptual, la responsabilidad se evalúa de igual modo que las situaciones en que un periódico publica un anuncio libeloso. No siempre fue así. Inicialmente se debatió si la comunicación *radial* configuraba libelo o calumnia a base de que la acción libelosa conllevaba responsabilidad *absoluta*. Al presente, la polémica es académica. Atrás ha quedado la responsabilidad sin culpa. W.L. Prosser y W.P. Keeton, *The Law of Torts*, 5ta ed. rev., Minnesota, Ed. West Publishing Co., 1984, Sec. 113, pág. 797; H.L. Nelson y D.L. Teeter Jr., *Law of Mass Communication*, 3ra ed. rev., Nueva York, Ed. The Foundation Press, 1978, págs. 80–81; D.H. Remmers, *Recent Legislative Trends in Defamation by Radio*, 64 Harv. L. Rev. 727 (1951); R.C. Donnelly, *Defamation by Radio: A Reconsideration*, 34 Iowa L. Rev. 12 (1948); R.A. Leflar, *Radio and TV Defama-*

*tion: "Fault" or Strict Liability?*, 15 Ohio St. L.J. 252 (1954); *Development in the Law of Defamation*, 69 Harv. L. Rev. 875, 907–910 (1956); Anotación, J.F. Ghent, *Defamation by Radio or Television*, 50 A.L.R.3d 1311.

Sin embargo, entre ambos medios de expresión existen ciertas diferencias cognoscibles. La radio, al igual que la televisión —como instrumentos de comunicación masiva, rápida y dinámica— se encuentran en una peculiar desventaja con relación a los medios impresos. Éstos tienen la oportunidad de revisar lo que van a publicar y, en alguna medida, determinar si sus escritos contienen manifestaciones difamatorias. Esta peculiaridad generó una gran oposición de las emisoras al enfoque impositivo de responsabilidad absoluta. Por un tiempo la jurisprudencia estuvo dividida. La cuestión culminó como respuesta a un movimiento encabezado por la Asociación Nacional de Radiodifusores (A.N.R.) promoviendo en las jurisdicciones estatales estatutos fundados en responsabilidad fundada en negligencia.(4)

---

(4) El proyecto modelo propuesto disponía:

"Sección 1. El propietario, concesionario u operador de una tele o radioemisora o de una cadena de difusoras, y los agentes o empleados de tal propietario, concesionario u operador, no serán responsables de daños causados por declaraciones difamatorias publicadas o enunciadas por otro en o como parte de una tele o radiodifusión, que no sea el propietario, concesionario u operador, o agente o empleado del mismo, a menos que la parte quejosa alegue y pruebe que dicho propietario, concesionario u operador, o su agente o empleado, *no tuvo el debido cuidado en prevenir la publicación o enunciación de tal declaración en dicha emisión.* Siempre y cuando, no obstante, que el ejercicio de debido cuidado incluya el cumplimiento bona fide con cualquier ley federal o reglamento de cualquier agencia reguladora federal.

"Sección 2. *En ningún caso*, sin embargo, *podrá responsabilizarse* a cualquier propietario, concesionario u operador, o a los agentes o empleados de dicho propietario, concesionario u operador de tal emisora o cadena de emisoras, *por los daños causados por cualquier declaración difamatoria enunciada a través de las instalaciones de tal emisora o cadena de emisoras pero en beneficio de cualquier candidato a un cargo público.*

"Sección 3. En cualquier acción de daños por declaraciones difamatorias publicadas o enunciadas en o como parte de alguna tele o radiodifusión, la parte

Las alternativas propuestas por la A.N.R. fueron esencialmente dos (2). La primera, una norma de responsabilidad por manifestaciones no políticas sujeta al criterio de negligencia clásica (*due care*), y la otra, inmunidad absoluta por toda manifestación vertida por o a nombre de un candidato político. Esta inmunidad fue criticada por el fundamento de que si el dueño promovía la difusión de manifestaciones falsas no debería gozar o ser acreedor de la misma. Como resultado, algunos estados aprobaron la propuesta de la A.N.R., otros la norma de negligencia para todo tipo de manifestación, incluso políticas, y los restantes la norma general de negligencia, pero con inmunidad similar a la concedida por la legislación federal. Remmers, *supra*; Leflar, *supra*.

█ Puerto Rico quedó rezagado. Tanto en lo civil como en lo penal prevalece el enfoque de responsabilidad ortodoxa por manifestaciones maliciosas sin diferenciar en cuanto a su interlocutor, según surge de la Ley Núm. 123 de 13 de mayo de 1937 (20 L.P.R.A. sec. 871 *et seq.*).(⁵) Este estatuto, sin

---

quejosa podrá recibir sólo aquellos daños reales que pueda alegar y probar." (Énfasis suplido y traducción nuestra.) R.A. Leflar, *Radio and T.V. Defamation: "Fault" or Strict Liability?*, 15 Ohio St. L.J. 252, 268 (1954).

(⁵) En lo pertinente dispone:

*"Deberes sobre reglamentación de material a radiodifundirse*

"Será deber de todo administrador, director o encargado de las estaciones radiodifusoras establecidas en Puerto Rico *evitar que se difunda a través de estaciones ningún anuncio, información, discurso o manifestación de clase alguna, de carácter injurioso, infamante u ofensivo que en forma alguna lesione la reputación o buen nombre de ninguna persona natural* o jurídica, institución o entidad alguna con derecho a ser protegida por parte del estado; *y todo administrador, director o encargado* de las estaciones radiodifusoras establecidas en Puerto Rico, y la persona o personas naturales o jurídicas a que tales estaciones pertenezcan, *responderán civilmente de los daños y perjuicios que mediante tales publicaciones o comunicaciones injuriosas, infamantes, u ofensivas, se causen a cualquier persona o personas naturales y jurídicas en el Estado Libre Asociado de Puerto Rico.*

. . . . . . . .

embargo, no es óbice para que reclamaciones como la autos —en abono a una efectiva protección de la libertad de expresión y prensa garantizadas constitucionalmente— sean adjudicadas en armonía con los modernos principios doctrinarios y la legislación federal que ocupa el campo en materia de comunicaciones radiales. R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, Puerto Rico, Ed. C. Abo. de P.R., 1986, Vol. I, págs. 402–403.

 Al respecto, la Comisión Federal de Comunicaciones —creada para reglamentar las comunicaciones y frecuencias por radio en protección del interés público— realiza la doble función de expedir las licencias y regular sus concesionarios. W. Overbeck y R.D. Pullen, *Major Principles of Media Law*, 2da ed. rev., Nueva York, Ed. College Publishing, 1985, págs. 274–283. La Ley de Comunicaciones de 1934, según enmendada, en su Sec. 315(a), 47 U.S.C. sec. 315(a), establece:

> Si algún concesionario permite a una persona que es *candidato legalmente certificado para algún cargo público utilizar una estación difusora*, le brindará la misma oportunidad *a todos los demás candidatos para dicho cargo* a utilizar la estación difusora: *siempre y cuando que dicho concesionario no*

---

*"Manifestaciones calumniosas y maliciosas*
"Toda palabra o concepto proferido maliciosa y públicamente *a través del radio en deshonra*, descrédito o menosprecio de otra persona natural o jurídica, se presumirá maliciosa; y será calumnia procesable a virtud de este Capítulo toda expresión calumniosa así hecha públicamente en presencia o en ausencia de la persona agraviada.
*"Penalidades*
"Toda persona convicta de infracción de la disposición de la sección anterior y todo administrador, director o encargado de cualquier estación difusora que permitiere que otra persona transmita manifestaciones o conceptos calumniosos según en este Capítulo se dispone, será culpable de un delito de calumnia, castigable con multa no menor de cien (100) ni mayor de quinientos (500) dólares o cárcel por un término mínimo de tres (3) meses y máximo de dos (2) años." (Énfasis suplido.) 20 L.P.R.A. secs. 877–879.

*tenga la facultad de censurar el material difundido bajo las disposiciones de esta sección.* No se impone ninguna obligación sobre cualquier concesionario de permitir el uso de su estación por cualquier candidato. La aparición de un candidato legalmente cualificado en cualquier

(1) noticiario *bona fide*,

(2) entrevista noticiosa *bona fide*,

(3) documental noticioso *bona fide* (si la aparición del candidato es incidental a la presentación del asunto o los asuntos cubiertos por el documental noticioso), o

(4) cubierta instantánea de eventos noticiosos *bona fide* (incluyendo, aunque sin limitaciones, convenciones políticas y actividades incidentales a las mismas),

no se considerará uso de una estación difusora dentro del significado de esta sección. Nada en la oración precedente deberá interpretarse en el sentido de que se releva a los difusores, en relación con la presentación de noticiarios, entrevistas noticiosas, documentales noticiosos, y cubiertas instantáneas de eventos noticiosos, de la obligación que les impone esta ley de funcionar en pro del interés público y brindar oportunidad razonable para la discusión de puntos de vista conflictivos sobre asuntos de importancia pública. (Traducción nuestra y énfasis suplido.)

 Esta sección persigue fomentar la más amplia discusión, sin restricciones, de los asuntos políticos por candidatos cualificados. *Farmers Union v. WDAY*, 360 U.S. 525, 529 (1959). Por tal razón se ha interpretado que las estaciones están impedidas de censurar las manifestaciones que hagan *los candidatos*, lo que a su vez implica inmunidad absoluta por cualesquiera expresiones difamatorias. *Farmers Union v. WDAY*, supra; *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 391 (1969); Prosser y Keeton, *op. cit.*, pág. 824; G.O. Robinson, *The FCC and the First Amendment: Observations on 40 Years of Radio and Television Regulation*, 52 Minn. L.R. 67, 127–131 (1967); ALI, *Restatement of the Law*, Second, Torts, 1977, págs. 257–258. Cualquier legislación estatal en contrario que imponga responsabilidad del dueño de

una emisora sería incompatible con este esquema federal. Esta cubierta protectora se extiende a manifestaciones originales como a aquellas difundidas en virtud de una concesión por tiempo igual (*equal opportunity*). *In re Port Huron Broadcasting Co. (WHLS)*, 12 F.C.C.2d 1069 (1948); *In re Hammond for Governor Committee*, 69 F.C.C.2d 946 (1978); J. Golomb, *Regulations of Indecency in Political Broadcasting*, 13 (Núm. 1) U. Mich. J.L. Ref. 69, 99 (1979).

■ Ahora bien, esta prohibición de censura e inmunidad derivada se circunscribe a cuando el candidato es quien utiliza los servicios de la estación de radio:

> . . . el lenguaje de la sección por sí mismo y su historial legislativo nos obligan a concluir que la sección aplica sólo al uso de estaciones emisoras por parte de un candidato personalmente, y que no aplica al uso de dicha emisora por otras personas que hablan en beneficio o apoyo del candidato.
>
> El lenguaje significativo de la Sección 315 es que si un concesionario "permite a alguna persona que sea un candidato legalmente cualificado para ocupar un cargo público utilizar una estación emisora, deberá darle igual oportunidad a todos los demás candidatos para el mismo cargo para usar dicha estación emisora". El uso a que se refiere es, naturalmente, la emisión de discursos al público votante. Debe notarse que la sección sólo se refiere a dicho uso por los candidatos si bien guarda completo silencio sobre el uso de las instalaciones de emisión por los que respaldan al candidato.
>
> . . . . . . . .
>
> Dado que la Sección 315 aplica sólo al uso de una radioemisora por el candidato mismo y no a dicho uso por sus partidarios, puede concluirse que la sección no prohíbe a los demandados censurar el discurso de Meade. *Por lo tanto, los demandados no tienen derecho a afirmar la defensa de que no son responsables porque los discursos no hubiesen sido censurados sin violar la Sección 315 y que, por lo tanto, no incurrieron falta alguna al permitir la difusión de los discursos.* Erró, pues, el tribunal de distrito al emitir una sentencia sumaria a su favor sobre este fundamento. (Traducción y énfasis

nuestros.) *Félix v. Westinghouse Radio Stations*, 186 F.2d 1, 3, 6 (3er Cir. 1950), *cert.* denegado 341 U.S. 909 (1951).

Aunque las manifestaciones difamatorias en el caso de autos fueron pronunciadas por Marrero Padilla, persona que no era candidato *cualificado*, esto no dispone de la controversia. Sin embargo, adviértase que fueron realizadas por un invitado del alcalde Rosario, candidato sí cualificado a la reelección, en un programa político pagado. Ello plantea directamente la disyuntiva de si el programa podía estar sujeto a censura y, en su consecuencia y por extensión, cobijar de inmunidad a la radiodifusora WGFE.

La interrogante no es nueva. La Comisión Federal de Comunicaciones ha resuelto que la cubierta de 47 U.S.C. sec. 315 no se limita a situaciones en que sólo se escucha la voz del candidato. Cuando la presentación personal del candidato es el *foco* de atención del programa y está bajo su dirección, ello constituye un *uso* del candidato y su contenido no es susceptible de ser censurado.

En general, creemos que, cuando la presencia personal oral o visual de un candidato es el foco del programa presentado, el programa constituye un uso bajo la Sección 315, *y la estación está impedida de censurar la selección del material del programa del candidato. Esta regla general está diseñada para circunstancias donde la presencia personal del candidato es substancial en términos de extensión, está integrada en el programa y es, de hecho, el foco del programa, y donde el programa está bajo el control y la dirección del candidato.* Así, en *Capitol Broadcasting Company, Inc.*, decidimos que una emisión televisada presentada por un candidato que constó de un filme de media hora con una declaración inicial de 10 minutos por parte del candidato y selecciones de un debate entre él y su oponente durante los 20 minutos restantes, constituía un uso bajo la Sección 315, no sujeto a censura por el concesionario. El mismo fundamento —que el uso bajo la Sección 315 para el cual el candidato hace su emisión es inmaterial vis a vis la prohibición contra la censura— fue crítica en la

decisión de la Comisión contenida en una carta del 15 de mayo de 1952 dirigida a WMCA, Inc. 7 R. R. 1132. La decisión en el caso de autos, al igual que las decisiones en las situaciones antes discutidas, está predicada sobre el objetivo básico de la Sección 315 —permitir a un candidato presentarse a sí mismo ante el electorado con absoluta libertad con respecto a los juicios del concesionario sobre la corrección o el contenido de dicha presentación. Véase *Farmers Union* v. *WDAY, Inc.*, 360 U.S. 525. La posición contraria no sería útil a tal objetivo y llevaría a resultados análogos.

En vista del objetivo básico de la Sección 315, el hecho de que el Sr. Logue decidió presentar su candidato al aparecer junto con otros no afecta de manera material su presentación como uso bajo la Sección 315. El Sr. Logue ha indicado que la aparición de los otros participantes sería en términos de un elenco de apoyo y que él tenía la intención de aparecer una y otra vez a través de la emisión como anfitrión y candidato (párrafo 2, supra). Esta situación es muy diferente a la presentada en *Félix* v. *Westinghouse, supra*, donde el candidato estaba totalmente ausente de la emisión. En vista de la presencia, participación y control del Sr. Logue en el programa por el propósito en obediencia a la disposición de tiempo igual de la Sección 315, las condiciones impuestas por Gray Communications Systems sobre sus apariciones en WJHG-TV violaron las disposiciones contra la censura establecida en la Sección 315.

Aunque, en este caso, la decisión de la Comisión está, naturalmente, limitada a los hechos presentados, sus párrafos 6 y 7, supra, son de aplicación general. Así, aunque los usos bajo la Sección 315 seguirán siendo resueltos caso por caso, los concesionarios deben estar conscientes de, para la Comisión, la disposición contra la censura establecida en la Sección 315, incluye todo material de propaganda presentado como parte de uso de las instalaciones emisoras por parte del candidato, *y el contenido de dicho uso*. (Traducción y énfasis nuestros.) *In re Gray Communications Systems, Inc. et al.*, 19 F.C.C.2d 532, 534–535 (1969).

Esta decisión ha sido consistentemente seguida. Su aplicabilidad implica evaluar factores tales como si la presencia

del candidato es sustancial en términos de tiempo; si está involucrado e integrado en el programa; si es su centro de atención, y si el programa está bajo su dirección y control. Véanse: *Use of Broadcast Facilities by Candidates for Public Office*, 24 F.C.C.2d 832, 839–840 (1970); *In re L.B. Wilson, Inc., et al.*, 37 F.C.C.2d 576, 577–578 (1972); *New Primer on Political B/cing and Cablecasting*, 69 F.C.C.2d 2209, 2245–2246 (1978); *CBS, Inc.*, 95 F.C.C.2d 1152–1160 esc. 12 (1983).(6)

En el caso que nos ocupa, las determinaciones de hecho del tribunal de instancia reflejan que el Alcalde Rosario, como candidato a reelección y centro de atención, contrató el tiempo de transmisión e invitó a varias personas a participar, incluso al codemandado Marrero Padilla. Su dirección y control fue activa. En los dos (2) programas participaron y hablaron cuatro (4) personas, incluso Rosario y Marrero Padilla. Todos estos hechos son indicativos de que el programa fue controlado y dirigido por el Alcalde Rosario, quien también participó en el mismo. Inclinan la balanza a favor de Blanco Pi quien, como propietario de la emisora WGFE, estaba impedido de censurar los programas y, por ende, es acreedor a inmunidad.

## IV

Finalmente, los recurrentes Maldonado-Negrón cuestionan la conclusión de que fueron temerarios al incluir a

---

(6) Radiodifusiones de manifestaciones difamatorias en un programa hablado (*talk show*) —que no constituyen programas de candidatos bajo el mencionado 47 U.S.C. sec. 315— pueden conllevar distintas adjudicaciones. Una tendencia judicial es estimar que la no utilización de un mecanismo de dilación para poder evaluar las llamadas telefónicas .antes de que salgan al aire, y así eliminar cualquier expresión objetable, constituye malicia real, pues implica una actuación con grave menosprecio de la información difundida. *Snowden v. Pearl River Broadcasting Corp.*, 251 So. 2d 403, 410 (1971). Una decisión en contrario es *Adams v. Frontier Broadcasting Company*, 555 P.2d 556 (1976).

Blanco Pi como demandado y los $500 en concepto de honorarios de abogado. Discrepamos.

Desde el primer momento Blanco Pi les indicó su posición de que no podía actuar como censor en el programa radial. Inmediatamente, de conformidad con la reglamentación federal, le concedió tiempo igual y puso a disposición las facilidades de la emisora. Al contestar la demanda reiteró tales defensas. En una etapa más avanzada del proceso, los recurrentes Maldonado-Negrón se opusieron a que fuera relevado de responsabilidad sumariamente. Blanco Pi tuvo que entrar al juicio en su fondo. Logró en instancia un dictamen favorable. Más aún, ha tenido que defenderse en este Foro. Estos trámites configuran temeridad dentro del concepto vigente. *Fernández v. San Juan Cement Co., Inc.*, 118 D.P.R. 713 (1987).

*Se dictará sentencia que expida el auto y confirme la del Tribunal Superior, Sala de Arecibo, ante el cual continuarán los trámites correspondientes.*